OVERFIELD et al. v. PENNROAD CORPORATION et al. (three cases).

WEIGLE et al. v. SAME (three cases).

Nos. 8288, 8289, 8303, 8304, 8371, 8372.

Circuit Court of Appeals, Third Circuit.

Argued Oct. 7, 8, 1943.

Decided Dec. 28, 1944.

[16] 11 U.S.C.A. § 110, sub. c.

Roscoe Pound, of Cambridge, Mass., for appellants Kaufmann and others.

Daniel O. Hastings, of Wilmington, Del. (R. E. Lee Marshall, of Baltimore, Md., Hugh F. O'Donnell, of New York City, George Cochran Doub, of Baltimore, Md., Philip H. Strubing, Paul Maloney, and Evans, Bayard & Frick, all of Philadelphia, Pa., Caleb R. Layton, 3d., John Van Brunt, Jr., and Hastings, Stockly and Layton, all of Wilmington, Del., and Marshall, Carey & Doub, of Baltimore, Md., on the brief), for plaintiffs.

Robert T. McCracken, of Philadelphia, Pa. (John Dickinson, of Philadelphia, Pa., Clarence A. Southerland, of Wilmington, Del., and Philip Price, John B. Prizer, Montgomery, McCracken, Walker & Rhoads, and Barnes, Dechert, Price & Smith, all of Philadelphia, Pa., on the brief), for Pennsylvania R. Co.

Morris Wolf, of Philadelphia, Pa., for Pennroad Corporation.

R. Sturgis Ingersoll, of Philadelphia, Pa., Elder W. Marshall, of Pittsburgh, Pa., and Thomas Stokes, W. Heyward Myers, Jr., Lewis M. Stevens, and Thomas Stokes, all of Philadelphia, Pa., for surviving directors and representatives of deceased directors of Pennroad Corporation.

 (header page number) 891

Charles H. Tuttle, of New York City, and William S. Pettit, of Far Rockaway, N. Y., for Stockholders' Committee of Pennroad Corporation, amicus curiæ.

Hugh Roberts, of Philadelphia, Pa., for intervenor-appellee Roberts.

Francis E. Walter, of Easton, Pa., for intervenor-appellee Costello.

Before BIGGS, JONES, and GOODRICH, Circuit Judges.

GOODRICH, Circuit Judge.

These actions were brought for an accounting and other relief against the Pennsylvania Railroad and certain individual defendants. The plaintiffs are shareholders of the Pennroad Corporation and have been joined in these actions by other shareholders as intervenors. The defendants are the Pennsylvania Railroad and certain individuals (or their personal representatives) who were directors or officers of the Pennsylvania Railroad Company and/or the Pennroad Corporation. The District Judge gave judgment in favor of the individual defendants for the reason that the suit was barred by lapse of time. He gave judgment in favor of the plaintiffs against the Pennsylvania Railroad, but not to the extent claimed by the plaintiffs. Both sides have appealed.

We consider first the problems arising out of the general question whether the liability of individual and corporate defendants is barred by lapse of time. The transactions of which the plaintiffs complained are eight in number and began in June, 1929, with the Detroit, Toledo & Ironton purchase. It has been found as a fact, and not disputed by either party, that "Neither of these suits was brought within six years after the commission of any act complained of."

The individual defendants in their respective pleadings pleaded limitations generally as well as laches and nonconcealment. The corporate defendant pleaded laches on the part of the plaintiffs in a sufficient fashion to permit the defense under any application of this doctrine.

The first problem is the orientation of this case into the law applicable in federal court. Federal jurisdiction is invoked solely on account of diversity of citizenship; there is no independent federal question involved in the plaintiffs' claims. If all the operative facts had occurred in

Pennsylvania and the actions were of a type formerly cognizable on the law side of the federal court there is no doubt that the Pennsylvania statute of limitations would control as to their timeliness. The same is true where, upon local facts, an action formerly cognizable in equity, is brought in federal court and the local statute is applicable to local suits in equity. Where the suit is brought in equity and is not in aid or support of a legal right, the jurisdiction on the equity side is said to be "exclusive" and the limitation period applicable is determined by the doctrine of laches as applied in federal courts, assuming that there is no local statute applicable to suits in equity. Where, however, the jurisdiction of equity is "concurrent" with that at law or the suit is brought in aid of a legal right, the state statute of limitations applicable to legal remedies and rights will be applied in the equity suit. With these propositions which have been recently enunciated by the Supreme Court in Russell v. Todd, 1940, 309 U.S. 280, 60 S.Ct. 527, 84 L.Ed. 754, before us, their application to the present litigation will be discussed.[1]

■ The problem of the individual defendants will first be considered. It is not necessary in this aspect of the case to separate these individuals with regard to their length of service with the Pennsylvania Railroad, the dates of their respective deaths, or any other matter which might distinguish individual cases. The sole question is based on the facts as above stated. They are immune from suit by reason of lapse of time.

The Pennsylvania Act of March 28, 1867, P.L. 48,[2] provides that " * * * no suit, at law or in equity, shall be brought or maintained against any stockholder or director in any corporation * * * to charge him * * * with any neglect of duty as such stockholder or director, except within six years after * * * the commission of such act of negligence by such stockholder or director." The trial judge applied this statute in favor of the individual defendants. The plaintiffs say this is error because, while the statute

sounds in terms of "neglect of duty" the present action is based on fraud and this particular statute is, therefore, inapplicable.

Fraud in the sense of conscious misstatement or other deliberate misrepresentation is clearly negatived by the findings made by the trial judge. He found the lack of moral culpability on the part of the directors. "The findings of fact and conclusions of law in this case," he said, "in no way cast any improper reflection on the personal honor and integrity of the defendants." [42 F.Supp. 586, 629] The plaintiffs do not dispute this statement, which while not made as a formal finding of fact was submitted as such finding pursuant to a direction by this Court at the conclusion of the argument to list findings of fact, either from the opinion or formally made.

■ This rather sweeping statement is buttressed by others more specific which, while not agreed to by plaintiffs, are not seriously attacked in argument. Thus, the judge found: "Here again it may be conceded that the directors acted conscientiously and without deliberate fraud or any intent to benefit themselves." "It is believed that they acted honestly and conscientiously and that there was no element of fraudulent intent or bad faith on the part of any of the persons involved, and that their default resulted from a misconception of their fiduciary position and primary duties." " * * * the directors, who are men of unimpeachable character and integrity, acting in the interest of serving their companies, have misconceived their duties * * *." "Their breach of duty and abuse of fiduciary obligations did not involve intentional moral delinquency." At the trial of the case only one of the individuals named as defendants was available as a witness. One was too ill to testify; the rest were dead. With the one exception noted, their own story of the conduct of events which led to this litigation was, therefore, not heard. Yet in their absence the findings of the trial judge upon the subject of personal culpability went the whole way to absolve them. The

---

[1] The Second Circuit, in York v. Guaranty Trust Co., 1944, 143 F.2d 503, has recently held that in a case of concurrent jurisdiction, the state statute does not necessarily control where the defendant is guilty of inequitable conduct causing plaintiff's ignorance of his rights. Regardless

of whether there are cases in which a federal court will not follow the state statute of limitations, we do not think the present case is one for the reasons which are set forth later in this opinion where the subject of concealment is discussed.

[2] 12 P.S.Pa. § 41.

plaintiffs have not shown us and we cannot find that the findings of the trial court were clearly erroneous.

■ Moral fraud is thus clearly eliminated. We think it does not clear the view of the case to speak of what happened as "constructive" fraud. If the descriptive adjective means anything it means that something less than fraud is going to be called fraud so as to attribute to it the same consequence as that applicable to fraudulent conduct. If directors violate their duty to the corporation on whose board they sit we do not need to resort to fictitious allegations of fraud to hold them liable. They are responsible for the neglect of fiduciary duty. That we think is the substance of plaintiffs' charges against these individual defendants and that was the way it was regarded by the trial judge as shown in the excerpts from his findings of fact, above quoted. That neglect of duty is squarely covered by the terms of the Act of 1867 and the directors in this case fairly come within it.

This conclusion is fortified by the Pennsylvania decisions under this statute and the general statute of limitations. The Pennsylvania court has, in a case where the plaintiffs charged direct misappropriation of corporate funds by the managers of a railroad company, seemingly applied the six year limitation period of the Act of 1867 to an action brought against the directors after the expiration of that time by a shareholder. Link v. McLeod, 1900, 194 Pa. 566, 45 A. 340. The authority of the case is not quite complete since it does not appear in the opinion of the lower court, adopted by the Supreme Court, which statute was relied upon.[3]

This decision was cited in a recent Pennsylvania case upon the subject, decided since this cause was submitted. Ebbert v. Plymouth Oil Co., 1943, 348 Pa. 129, 34 A. 2d 493.[4] This, too, was an action by a shareholder suing in equity to compel a restoration to a corporation (also a Delaware corporation) of a sum of money plaintiff alleged to have been improperly expended by the corporation directors for a purpose for which corporate funds should not have been spent. The impropriety of the expenditure charged was so serious as to amount to a charge of misappropriation comparable to that in Link v. McLeod. Mr. Justice Horace Stern, writing the opinion for the Supreme Court of Pennsylvania, cited that decision and said in accepting that case as a precedent: "it would follow that the Act of 1867 is applicable to the present proceedings."[5] Then he went on to say that it is well established that equity will frequently adopt and apply the statute of limitations which controls analogous proceedings at law. One of those cases is where an accounting is sought, that being the case of concurrent equitable jurisdiction only. From that he concluded that whether the Act of 1867 was considered applicable to the then case ex proprio vigore, or that the general six year limitation should be adopted by way of analogy to proceedings at law, the result was the same. The six year limitation was applicable. The applicability of the general state of limitations to the defendants is discussed below, in connection with the limitations defense of the Pennsylvania Railroad. As shown there, we find it also applicable.

The words of the Pennsylvania statute, the findings as to the conduct of the directors of Pennroad and the application of the statute of limitations by the Pennsylvania courts clearly leave the directors free from liability in this litigation, except for the question of concealment. This will be considered later.

We turn now to the question whether the defense of lapse of time should be applied in favor of the Pennsylvania Railroad. Here the problem is whether the Pennsylvania general statute of limitations[6] limiting the time for bringing an ac-

---

[3] An examination of the briefs discloses that both statutes were urged. It was also claimed, as here, that there was no actual fraud, at most "constructive" fraud.

[4] This case was cited and approved in Naffah v. Diebold et al., 1944, 349 Pa. 219, 36 A.2d 782.

[5] 348 Pa. at page 134, 34 A.2d at page 495.

[6] The Act of March 27, 1713, 1 Sm.L. 76, § 1, 12 P.S. § 31 provides:

"Personal actions, when to be brought

"All actions of trespass quare clausum fregit, all actions of detinue, trover and replevin, for taking away goods and cattle, all actions upon account and upon the case (other than such accounts as concern the trade of merchandise between merchant and merchant, their factors or servants), all actions of debt grounded upon any lending, or contract without specialty, all actions of debt, for arrearages of rent, except the proprietaries' quit-rents, and all actions of trespass, of assault, menace, bat-

tion to six years is applicable or whether the plaintiffs are to be barred, if at all, by the general equitable doctrine of laches. If the general doctrine of laches governs, then we must examine the facts to see whether they make out such undue delay as to bar the plaintiffs because of the probable prejudice to the defendants through lapse of time. If the general statute applies, either of its own force or because equity adopts it as conclusive on delay, which would be the case if the equity jurisdiction here is concurrent with that at law, or in aid of a legal right, then no examination of facts is necessary.

■ The claims asserted in this case are claims by the corporation, Pennroad, against others who under the theory of the complaints have done things to the injury of Pennroad. The individual shareholder of Pennroad is concerned only because he has an interest in the corporate enterprise, not through any individual claim of his own against those who, by their wrongs, injure the corporation of which he is a member. What was claimed here was the failure of the directors of the Pennroad corporation to do their duty as such directors and the participation in their breach of duty by the corporate defendant, the Pennsylvania Railroad, whom they also served. For this claim an action at law

could have been brought had the appropriate officers of Pennroad, through corporate action, desired to bring it.[7] The fact that an accounting was asked for in addition to money damages would not have changed the action at law to one cognizable exclusively in equity. Equity jurisdiction, where an accounting is sought from one who has breached a fiduciary duty, such as that owed by a corporate director, is concurrent with that at law.[8] The shareholder gets into the litigation only by a derivative suit. The right being enforced is that of the corporation of which he is a member. He gets into court because he shows that the corporation, through its appropriate officers, neglects or refuses to enforce rights belonging to the corporation, the enforcement of which will, of course, be to the advantage of all the shareholders. The proposition is carefully stated by Pomeroy[9] as follows:

"The stockholder does not bring such a suit because *his* rights have been *directly* violated, or because the cause of action is *his,* or because *he* is entitled to the relief sought; he is permitted to sue in this manner *simply in order to set in motion the judicial machinery of the court.* The stockholder, either individually or as the representative of the class, may commence the suit, and may prosecute it to judg-

---

tery, wounding and imprisonment, or any of them, which shall be sued or brought at any time after the five and twentieth day of April, which shall be in the year of our Lord one thousand seven hundred and thirteen, shall be commenced and sued within the time and limitation hereafter expressed, and not after; that is to say, the said actions upon the case, other than for slander, and the said actions for account, and the said actions for trespass, debt, detinue and replevin, for goods or cattle, and the said actions of trespass quare clausum fregit within three years after the said five and twentieth day of April next, or within six years next after the cause of such actions or suit, and not after. And the said actions of trespass, of assault, menace, battery, wounding, imprisonment, or any of them, within one year next after the said five and twentieth day of April next, or within two years next after the cause of such actions or suit, and not after; and the said actions upon the case for words, within one year next after the words spoken, and not after."

7 3 Fletcher, Cyclopedia Corporations (Perm.Ed.1931) § 1271 and cases cited; 2

Thompson on Corporations. (2nd Ed.1909) §§ 1310, 1312, 1313.

8 "The most important, comprehensive, and multiform remedy of the concurrent jurisdiction which results in pecuniary recovery is that of accounting. * * * Among the most common instances in which this remedy is employed by courts of equity are the ascertainment and settlement of claims and liabilities between principals and agents, and between all other persons standing in fiduciary relations to each other * * *." 1 Pomeroy, Equity Jurisprudence (5th Ed.1941) § 186a.

"* * * receivers, directors, and other managers of stock corporations, and the like, are in a general sense trustees, or rather *quasi* trustees, in respect of the particular persons towards whom they stand in a fiduciary relation,—* * *, stockholders, etc. But the analogy should not be pushed too far. The trust which exists in these and similar cases is not of so high and complete a character that equity has an exclusive jurisdiction over the rights and interests of the beneficiaries, to maintain and enforce them against the trustees." Id. § 157; see also § 158.

9 4 id. § 1095.

ment; but in every other respect the action is the ordinary one brought by the corporation, it is maintained directly for the benefit of the corporation, and the final relief, when obtained, belongs to the corporation, and not to the stockholder-plaintiff. The corporation is, therefore, an indispensably *necessary* party, not simply on the general principles of equity pleading in order that it may be bound by the decree, but in order that the relief, when granted, may be awarded to it, as a party to the record, by the decree. This view completely answers the objections which are sometimes raised in suits of this class, that the plaintiff has no interest in the subject-matter of the controversy nor in the relief. In fact, the plaintiff has no such *direct* interest; the defendant corporation alone has a direct interest; the plaintiff is permitted, notwithstanding his want of interest, to maintain the action solely to prevent an otherwise complete failure of justice."

The findings of the trial judge with respect to the unwillingness of the directors of Pennroad to enforce its alleged legal rights are sufficient to justify the resort to equity in a stockholder derivative suit.[10] But the fact that the shareholder gets into the litigation through a bill in equity does not change the fact that the right to be enforced is the legal right of the corporation.[11] We have then a sit-

uation where equity is resorted to merely as a means of enforcing a legal claim. The description usually given is that this is a situation where the jurisdiction of equity is concurrent. The jurisdiction is concurrent, although equity is resorted to as a means of putting the machinery in motion and although, also, the relief given by an equity court may in a given case be more complete and satisfactory than that afforded through a judgment at law.[12]

Now what is the situation with regard to the application of a statute of limitations where a suit of this kind is in equity, but where the jurisdiction of equity is concurrent? In so far as that situation is governed by state decisions the Pennsylvania rule, fully and broadly discussed in the recent decision of Mr. Justice Stern in Ebbert v. Plymouth Oil Co., already referred to, is perfectly clear. If the case is one of concurrent equity jurisdiction, as the Pennsylvania court held it was, the statute that bars the legal right bars recovery upon it in an action at law or a suit in equity. This last discussion of the matter by the Pennsylvania Supreme Court[13] leaves no doubt upon that point.

When we turn to the authorities generally we find the same rule established by the overwhelming weight of decision.[14] We shall not discuss the cases in detail but point out that one case directly on the

---

[10] The court affirmed plaintiffs' requested finding that "it would have been useless for any stockholder of Pennroad, including the complainants in this case, to have asked the management to seek the relief here sought."

[11] Note (1939) 39 Col.L.Rev. 842, 847: " * * * the courts view the cause of action as essentially that of the corporation and apply the statute of limitations or not, depending on the 'nature' of the cause of action in the hands of the corporation." Note (1938) 47 Yale L.J. 1004: " * * * the majority opinion has been that the relationship of the parties is in itself unimportant and, that the limitation period applied should be one which would have controlled had the corporation brought the suit." And, see cases cited infra, f. n. 13.

[12] Equity, of course, does not have exclusive jurisdiction merely because the remedy at law is inadequate. See 1 Pomeroy, Equity Jurisprudence, Pt. I, Ch. I; Mc-Clintock, Equity (1936) § 40. In fact it is the inadequacy of the legal remedies to do complete justice that furnishes the founda-

tion of the concurrent jurisdiction. 1 Pomeroy, Equity Jurisprudence § 217.

[13] Ebbert v. Plymouth Oil Co. was cited and approved in Naffah v. Diebold et al., 1944, 349 Pa. 219, 36 A.2d 782.

[14] Kelly v. Dolan, 3 Cir., 1916, 233 F. 635. Cf. McNair v. Burt, 5 Cir., 1934, 68 F.2d 814 (suit by receiver); Hughes v. Reed, 10 Cir., 1931, 46 F.2d 435 (suit by receiver); Cooper v. Hill, 8 Cir., 1899, 94 F. 582 (suit by receiver); Anderson v. Gailey, D.C.N.D.Ga.1929, 33 F.2d 589 (suit by receiver); see also, Curtis v. Connly, 1921, 257 U.S. 260, 42 S.Ct. 100, 66 L.Ed. 222 (suit by receiver). These actions, although brought at the instance of receivers, were equitable actions seeking recoveries for mismanagement, breach of duty, and the like.

State decisions: Blythe v. Enslen, 1922, 209 Ala. 96, 95 So. 479; Arrigoni v. Adorno, 1943, 129 Conn. 673, 31 A.2d 32; New York: ". . . the present New York rule appears to be that, irrespective of the identity of the plaintiff, the equitable statute is applied only when the underlying cause of action could not adequately be

point is that of this Circuit in Kelly v. Dolan, 3 Cir., 1916, 233 F. 635, 639, 640. The Court said: "But, assuming for the present purpose that equity had jurisdiction to litigate this claim [neglect of duty by directors] at the instance of a stockholder, it is manifest that such jurisdiction is concurrent with that of a court of law to litigate the claim at the instance of the receiver, and, being concurrent, the claim is barred in equity by the statute of limitations. * * * To hold otherwise would be to aid a plaintiff to evade a statute by going on the equity instead of the law side of a court." Thus, whether we look to the Pennsylvania authority or to the weight of legal opinion generally the same result is reached. The case is one of concurrent equity jurisdiction; the statute which bars the enforcement of the legal right at the suit of the corporation for mismanagement or breach of duty, bars it in equity at the instance of a shareholder. Obviously, this same bar protects the directors of the Pennsylvania Railroad in this case, even though the Act of 1867 had not, itself, given them immunity from suit. The conclusion is clear then, that unless there was something to toll the running of the statute, plaintiffs are barred from recovery both against the corporate defendant as well as the individual directors.

We turn, therefore, to the remaining question of whether the running of the statute was tolled. Fraud in the moral sense, that is conscious misstatements of facts, may be dismissed from consideration. Obviously, the corporation, itself, could make no statements except through the individuals who were its spokesmen and the nature of their conduct so far as it concerns personal honesty has already been disposed of in the discussion of the findings made by the trial judge on that point. Whatever effect the existence of actual fraud might have upon the running of the statute does not call for consideration here.

■ The plaintiffs say, however, that there was concealment and such concealment as would toll the running of the statute under Pennsylvania law. We are confronted at the outset, however, with the proposition, laid down over and over again in the Pennsylvania decisions [15] that the concealment which tolls the statute must be an affirmative, independent act of concealment; mere silence or nondisclosure, even by corporate officials is not enough. The time at which it takes place is immaterial whether before, contemporaneous with or subsequent to the act complained of. But independent act, "affirmative efforts to divert, mislead, or prevent discovery" [16] there must be. We do not see here any such conduct independent of the very things about which the plaintiffs complain. The plaintiffs complain of investments and say that they were made with an eye not to Pennroad's interest, but that of the Pennsylvania Railroad. But the sum and substance of that complaint is a series of transactions which alone make up the gravamen of the alleged offenses. We see no independent acts, designed to "divert, mislead, or prevent discovery", unless they be found in the facts and circumstances under which the Pennroad venture was launched. Those facts and circumstances and the subsequent conduct of the Penn-

---

treated at law." Note (1941) 41 Col.L. Rev. 686, 691. The author points out that originally, the New York decisions, held, through a misapprehension, as the court did in Backus-Brooks Co. v. Northern Pac. R. Co., infra, that since the shareholders could sue only in equity, the equity jurisdiction was exclusive. Wallace v. Lincoln Sav. Bank, 1891, 89 Tenn. 630, 15 S.W. 448, 24 Am.St.Rep. 625 (suit by shareholder and creditor on behalf of all other shareholders and creditors). Cf. Boyd v. Mutual Fire Ass'n of Eau Claire, 1903, 116 Wis. 155, 90 N.W. 1086, 94 N.W. 171, 61 L.R.A. 918, 96 Am.St.Rep. 948 (suit by creditors); Pietsch v. Wegwart, 1922, 178 Wis. 498, 190 N.W. 616 (suit by purchaser of all the stock and assets of a corporation).

Contra: Backus-Brooks Co. v. Northern Pac. R. Co., 8 Cir., 1927, 21 F.2d 4, certiorari denied 1927, 275 U.S. 562, 48 S.Ct. 120, 72 L.Ed. 427; Broomfield v. Doolittle, D.C.S.D.N.Y.1942, 2 F.R.D. 517. Cf. Greenfield Savings Bank v. Abercrombie, 1912, 211 Mass. 252, 97 N. E. 897, 39 L.R.A.,N.S., 173, Ann.Cas. 1913B, 420 (suit by receiver; court considered directors as "express" trustees for purpose of statute of limitations, a doctrine repudiated by the cases cited, supra, this footnote).

[15] Smith v. Blachley, 1901, 198 Pa. 173, 47 A. 985, 53 L.R.A. 849; Hall v. Pennsylvania R. Co., 1917, 257 Pa. 54, 100 A. 1035, L.R.A.1917F, 414; Deemer v. Weaver, 1936, 324 Pa. 85, 187 A. 215; Bailey v. Jacobs, 1937, 325 Pa. 187, 189 A. 320; Ebbert v. Plymouth Oil Co., supra.

[16] Deemer v. Weaver, supra, 324 Pa. at page 88, 187 A. at page 216.

road directors do not bear out plaintiffs' charge of concealment. Let us look for a moment at the facts surrounding the inception of the Pennroad venture.

The whole matter had been discussed by Pennsylvania Railroad people prior to the spring of 1929. As part of the Pennroad promotion, a letter signed by W. W. Atterbury, President of the Pennsylvania Railroad, was sent to 157,000 shareholders of that company on April 24, 1929 and written on the letterhead of the Pennsylvania Railroad. It contained the following paragraph:

"Your Directors have given earnest consideration to recent developments in the field of transportation, and have reached the conclusion that it will be of material advantage to this Company and its stockholders, for the stockholders to unite in establishing a corporation so organized that it may make investments and take advantage of opportunities on a much broader basis than is possible under the limited powers of a railroad company. Your Directors are of the opinion that such an independent instrumentality is needed to protect your interests and those of your Company."

Simultaneously, there went through the mails a letter of the same date upon the letterhead of the Pennroad Corporation, which had then been formed, signed by that corporation through its President, H. H. Lee, making the offer of share subscriptions, naming the first board of directors of Pennroad and calling attention to the fact that seven of them were members of the board of directors of the Pennsylvania Railroad.[17] This letter also informed prospective subscribers that all of the common stock was being placed in a voting trust for ten years. Both of these letters were sent to the then shareholders of the Pennsylvania Railroad and their right to subscribe for shares in the new Pennroad venture was based upon their holdings of record in the Pennsylvania Railroad.

When Pennroad was incorporated its charter, paragraph 7 of article 8 provided that "Except as may be required by law, the Corporation shall not be required to make public in any manner, to its stockholders or otherwise, any statement concerning its assets, liabilities or earnings; * * *." A similar provision was also contained in section 7 of article VII of the by-laws. Both of these documents, of course, are matters of public record. Subscribers bought and received voting trust certificates not share certificates. The plaintiffs talk about the manner of the initiation of the venture as concealment aforehand. This presupposes that the directors of Pennroad and Pennsylvania had a premeditated scheme to organize Pennroad as a sham corporation to fleece its shareholders and to hide what they intended to do by a skillfully drawn charter, by-laws, and other corporate forms. However, the findings as to the personal integrity of the individual defendants, the substantial sums invested by the latter and their friends in Pennroad certificates, and the publicity attending the Pennroad transactions, as developed further in this opinion, negative the notion that such was the purpose underlying the charter and by-law provisions. The prospective subscribers knew the relation of the venture to the interests of the Pennsylvania Railroad. They were written to as shareholders of that railroad in the first instance. The very name of the corporation carried a suggestion of its affiliation with the Pennsylvania Railroad.[18] In fact, the plaintiffs have averred in their complaints that they made their purchases in reliance on the letters of April 24th, describing the Pennroad-Pennsylvania relationship. The Pennsylvania people were, obviously, in charge of a venture to which they, the subscribers, were told they were entitled to no information except as provided by law. Nor did the plaintiffs seek information about the affairs of the corporation into which they had bought from directors or other corporate officers.[19]

---

[17] There were altogether eight Pennroad directors named as being on the first board. H. H. Lee was the eighth one.

[18] The plaintiffs' requested finding that "The name 'Pennroad' was given to the new company in order to more definitely identify it with Pennsylvania," was affirmed by the trial judge.

[19] The following findings are undisputed: There is no evidence that any of the plaintiffs or intervenors ever made any inquiry of the officers or directors of The Pennroad Corporation in respect of any matter here complained of.

There is no evidence that any of the plaintiffs or intervenors ever made any inquiry of the officers or directors of The Pennroad Corporation that was not fully answered.

▆▆▆ Not only is there an absence of affirmative acts of concealment, but the directors did disclose the transactions complained of. Many years before this action was brought, the plaintiffs received a great deal of information, even though they were in no legal position to require its production. During the period when Pennroad was making its purchase of shares of other corporations its management did not disclose to its shareholders or the public the fact of such purchases. Its explanation is that such information would have been harmful to its own shareholders by increasing the price which Pennroad would have had to pay for the stock it was buying. Whether that was so or not, it is undisputed that beginning with 1930 various reports to Pennroad's shareholders disclosed the list of all of its holdings, the price at which they were purchased and, in case the shares had an established market value, the then selling price.[20] Indeed, some reports set out in disheartening detail the long lists of securities purchased at the 1929 market prices and footed the total purchase cost comparing it with the sadly shrunken values as of the date of the report. These reports not only went to shareholders but were given to the usual publication media which carry financial news and to the daily press. Facts concerning the Pennroad venture were brought to light in the Splawn report and Pecora investigation by Congressional committees in 1931 and 1932. The trial court found that there was no evidence that the plaintiffs actually knew the facts disclosed by these investigations. Whether they did or not they are matters of general public information. Courts can and do take judicial notice of such Congressional proceedings [21] and the existence of facts disclosed by them is certainly relevant on any question of conceal-

ment. Finally, in 1932, a suit was filed in the Delaware Court of Chancery, by a Pennroad shareholder, complaining generally on charges similar to those made in this action.

To conclude, therefore, on this point: there was not only no concealment, but there was in fact a much fuller disclosure than the corporation and directors were obligated by their agreement with the subscribers to make.

▆▆▆ The plaintiffs claim that, in any event, the running of the statute was tolled by a suit covering the same causes of action in general terms filed in the Delaware Court of Chancery, by another shareholder, Perrine, in 1932. This action is still pending, it not even having come to trial. This contention is not pertinent here.

▆▆▆ The applicable statute of limitations is that of Pennsylvania.[22] If the action is barred by the Pennsylvania statute of limitations, no action can be maintained in Pennsylvania, even though the action is not barred elsewhere.[23] Suit must be brought in Pennsylvania before the Pennsylvania statute has run. A suit in another state can no more toll the Pennsylvania statute, applicable to suits in Pennsylvania, than an unexpired claim under the statute of another state can operate to lift the Pennsylvania bar in Pennsylvania courts. " * * * it would be impossible to contend successfully for the proposition, that a suit commenced in another state would take a case out of the statute of limitations of Massachusetts, in an action pending here." Mr. Justice Story in Delaplaine v. Crowninshield, C.C.D.Mass.1824, 7 Fed.Cas.No.3,756.[24] This situation is significantly different from the case where suit is started in Pennsylvania and thus tolls the Pennsylvania statute. Then it is

---

[20] The statement for 1930 listed the various stocks owned by Pennroad, the amount of each, the bonds owned and their par value. For the years 1934 to 1937 inclusive the cost of each of the holdings was listed. The statements for the years 1931, 1932, and 1933, listed in addition to the cost, the current market quotations of each of the securities, in cases where they were available. The statements also reported the current income of Pennroad, its assets, liabilities, etc.

[21] See United States v. Darby, 1941, 312 U.S. 100, 109, 657, 61 S.Ct. 451, 85 L. Ed. 609, 132 A.L.R. 1430; Louisville Gas & Electric Co. v. Federal Power Commission, 6 Cir., 1942, 129 F.2d 126, 134, cer-

tiorari denied 1943, 318 U.S. 761, 63 S. Ct. 559, 87 L.Ed. 1133.

[22] In re Newton's Estate, 1911, 46 Pa. Super. 40, 44 (action against stockholder of insolvent New Jersey corporation); In re Mercer's Estate, 1938, 330 Pa. 475, 199 A. 481; Ebbert v. Plymouth Oil Co., supra (action against directors and promoters of a Delaware corporation).

[23] Restatement, Conflict of Laws (1934) § 603.

[24] See also, Fisher v. Reaser, 1943, 113 Ind.App. 292, 46 N.E.2d 280. Cf. Elder v. McClaskey, 6 Cir., 1895, 70 F. 529, certiorari denied 1896, 163 U.S. 685, 16 S.Ct. 1201, 41 L.Ed. 315; Hooker v. East Riverside Irr. Dist., 1918, 38 Cal.App. 615, 177

possible that the Pennsylvania statute would be tolled as to all shareholders subsequently asserting the same claims.[25] The Delaware suit does not toll the running of the Pennsylvania statute.

Certain subordinate arguments have been made in connection with the tolling of the statute. These have been examined and carefully considered. We think there is no merit in them nor is there anything to be gained by elaborate elucidation of the obvious.

In this discussion we have endeavored to refrain carefully from passing any opinion upon the merits of the plaintiffs' claims. As was pointed out at the beginning, the suits are in federal court purely upon grounds of diversity. It is our obligation to apply the state law where applicable and this we have done. The result is the clear conclusion that the actions in Pennsylvania were brought too late.

The judgment of the District Court in favor of the individual defendants is affirmed; the judgment of the District Court against the Pennsylvania Railroad Company is reversed and the case remanded with directions to enter judgment in its favor.

JONES, Circuit Judge (concurring).

I fully concur in the opinion for the Court but, in view of the dissent, I am constrained to add to the debate.

Before the matters of complaint can become appropriate for treatment or discussion on their merits, we first have the duty of ascertaining the pertinent law and of following it accordingly. I pass, therefore, immediately to a consideration of the controlling law.

Federal jurisdiction of the instant cases rests solely on the ground of diversity of citizenship. The applicable law, therefore, is the law of the State local to the situs of the District Court. The rule of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, is equally pertinent to federal court equity suits where jurisdiction depends on diversity of citizenship. Ruhlin v. New York Life Insurance Co., 304 U.S. 202, 205, 58 S.Ct. 860, 82 L.Ed. 1290. Furthermore, a federal court, so

bound, must follow the local rule of conflicts as well. See Klaxon Company v. Stentor Electric Manufacturing Co., Inc., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477. So far, there would seem to be no disagreement among the members of this Court. The difference of opinion arises with regard to what law a Pennsylvania court would apply, directly or by reference, were the suits on trial in a court of that State. I think the answer is peculiarly forsworn for us by our earlier decision in Overfield v. Pennroad Corporation et al., 3 Cir., 113 F.2d 6.

When the Overfield case was here before on the plaintiff's appeal from the District Court's dismissal of her suit for want of jurisdiction, we reversed and reinstated the bill, for further proceedings. In reversing, we necessarily had to pass upon each of the reasons assigned by the defendants in support of their motion to dismiss, whether or not the court below had done so. One of those reasons was (113 F.2d at page 9) that the District Court lacked jurisdiction "because the present action involves the internal affairs and management of a Delaware corporation not transacting business in the Commonwealth of Pennsylvania or the Eastern District thereof [the situs of the District Court]."

Upon resorting to Pennsylvania law, we held that the suit did "not involve the management or control of the internal affairs of Pennroad, the foreign corporation" and that "The relief sought is the imposition of liability upon the Pennsylvania Railroad Company and former directors of Pennroad for alleged wrongdoing and an accounting by the railroad to Pennroad for consequent losses." Accordingly, we overruled the defendants' plea of no jurisdiction on the authority of Loan Society v. Eavenson, 241 Pa. 65, 88 A. 295.

Such being the situation, it cannot be said under any Pennsylvania rule that a court of that State, having taken jurisdiction of the causes, would make reference to and apply the law of the State of the foreign corporation's domicil for the adjudication of the rights of the parties if they were before a court of Pennsylvania. Obviously, if the law of the foreign corporation's domicil were pertinent, because the suit involved the management of the

P. 184, 187; Baker v. Cohn, 1st Dept. 1943, 266 App.Div. 236, 41 N.Y.S.2d 765.
25 See Southern Pacific Company v. Bogert, 1919, 250 U.S. 483, 488–490, 39 S.

Ct. 533, 63 L.Ed. 1099; Maas v. Sullivan, Sup.1924, 124 Misc. 295, 207 N.Y.S. 181, affirmed 1st Dept. 1925, 213 App.Div. 820, 208 N.Y.S. 895.

internal affairs of the corporation, then, the case would not present a right ordinarily cognizable in a court of Pennsylvania. Thompson v. Southern Connellsville Coke Co., 269 Pa. 500, 112 A. 533. We must, therefore, either apply the law applicable to the instant suits as a Pennsylvania court would do or else we deny the basis for a cause of action cognizable under the law of that State.

That the matters of complaint averred by the plaintiffs would be adjudged in Pennsylvania according to the law of torts, I think the Eavenson case makes plain. That suit was "a proceeding to compel the defendants to account for losses sustained by the corporation by reason of their negligent and fraudulent acts * * * while they were acting in their official capacity as directors." Any investigation into the management of the affairs of the corporation was necessary only "to establish the tortious acts of the defendants" for which reparation was sought. See the Eavenson case, supra, 241 Pa. at page 69, 88 A. at page 296.

Whether the tort law to be applied in the instant cases is to be found directly from Pennsylvania's own rules or by reference to the law of other States, in accordance with Pennsylvania's rule of conflicts, depends, in the first instance, on the place of the commission of the alleged wrongs. If, perchance, they were perpetrated in as many different States as the dissent suggests, then, conceivably, Pennsylvania in order to avoid a confusion of standards or because of uncertainty as to the place of the wrongs might apply its own law. After all, "the extent to which [a state] shall apply in its own courts a rule of law of another state is itself a question of local law of the forum." Magnolia Petroleum Co. v. Hunt, 320 U.S. 430, 445, 64 S.Ct. 208, 216, 150 A.L.R. 413. But, from whatever source Pennsylvania would derive the law applicable to the instant suits, none of it would come from the law of Delaware where, undeniably, none of the alleged wrongs can be said to have been committed.

So far as I am aware, Pennsylvania has no rule which would require a court of that State in a trial for a tort (whether on the court's law or equity side), to apply the law of the domicil of the aggrieved foreign corporation by or in behalf of which the suit was brought. Nor do I think that any of the Pennsylvania cases

cited in the dissent suggests to the contrary. In any event, whether a Pennsylvania court would derive the pertinent law directly from that State's own substantive rules or, by reference, from the law of another State, it would be Pennsylvania law none the less, when applied, and the question still remains whether a Pennsylvania court is required, merely because a claimant is of foreign domicil, to afford its facilities for the litigation of a claim which the State's statutes of limitation denounce as stale.

It seems plain (and I do not understand the dissent to dispute) that a Pennsylvania court would be under the duty of applying that State's statutes of limitation, when interposed, to suits for causes such as are pleaded in the instant cases. That is so whether the suits be brought on the court's law or equity side, the jurisdiction of equity for the purpose being concurrent. See cases cited in majority opinion. A federal court, bound to follow the law of the State, could hardly do otherwise. If a cause of action becomes cognizable in a federal court sitting in Pennsylvania, because it would be likewise cognizable in a court of that State, but the federal suit is to be relieved of the impediments which a Pennsylvania court would be bound to enforce, if pleaded, then a right under Pennsylvania law will be accorded to federal court litigants in that State which they would not enjoy in a court of the State. Such a result, if effected, would constitute an unwarranted impairment of the rule of Erie Railroad Co. v. Tompkins.

Wherein then is the escape from the barrier of the pleaded limitations? It is suggested that it lies in the fact that the instant suits are in equity in a federal court. But, as already noted, the rule of Erie Railroad Co. v. Tompkins extends to suits in equity in federal courts when their jurisdiction depends upon diversity of citizenship. Ruhlin v. New York Life Insurance Co., supra. In any event, the suggested immunity in a federal equity court from the bar of limitations to be found in otherwise applicable local law is by no means absolute. The recent case of York v. Guaranty Trust Co. of New York, 2 Cir., 143 F.2d 503, which the dissent cites and relies upon, expressly recognizes (143 F.2d at page 527) that applicable local statutes of limitation have been enforced by federal courts, sitting in equity in diversity cases, where "either (a) there was no

showing whatever of any inequitable conduct of the defendant accounting for plaintiff's ignorance of his rights or (b) the plaintiff, after becoming aware of his rights, slept on them." Not one, but both, of the specified contingencies were present here as the indisputable facts of these cases make plain.

The absence of any disqualifying concealment is fully treated with in the majority opinion. I shall not, therefore, duplicate the discussion. It may be pointed out, however, that the pertinent inquiry upon a search for concealment is not bounded by how much could have been told Pennroad's stockholders but by how much the directors were under a legal duty to disclose to them. There is hardly a definable limit to what an outraged imagination, sprung from a chastened hindsight, may not later suggest as having been appropriate matter for prior disclosure. It should also be borne in mind that, according to the trial court's undisputed findings, not a single one of the present plaintiffs or intervenors ever demanded any information of Pennroad or of its directors and, of course, no information was refused them, as the trial court also found.

But, it is said that even if the instant suits are subject to Pennsylvania's statutes of limitation, the Overfield suit was filed timely. In the light of the record now before us, I utterly fail to see any basis for that statement. Not once, but three times, the trial court separately affirmed that "Neither of these suits was brought within six years after the commission of the acts complained of." And, in a fourth instance, the trial court found to the same effect, but in affirmative language, as follows: "Each suit was begun more than six years after the acts of which plaintiffs complain had occurred." Nor have I been able to discover, from an examination of the voluminous record and briefs, where those findings are disputed by anyone.

The fact that the Overfield suit, which complained only of the National Freight Company transaction, was filed within one day of six years from the time of the action taken by Pennroad's directors looking to the disposition of Pennroad's interest in the National Freight Company did not serve to toll the statute. The matter of complaint in respect of the National Freight Company is not the directors' sale of it but their investing Pennroad's money in it which, in its entirety, happened more than six years prior to the filing of the Overfield suit. So that, even if the seven other separate matters of complaint, which the Weigle suit first brought upon the record well over six years after their occurrence, could legally be tacked on to the National Freight Company transaction of the Overfield complaint as constituting similar overt acts of one continuing conspiracy, the suits would still be outlawed, for the earliest of them was not brought within six years of the happening of any of the matters complained of.

The validity of the reasoning of the majority opinion and the legal merit of the disposition which this Court now makes of the instant appeals seem to me to stand unimpaired.

GOODRICH, Circuit Judge, agrees with this concurrence.

BIGGS, Circuit Judge (dissenting).

I must dissent from the views expressed by the majority. In order to make my reasons clear it is necessary to refer at length to the pleadings, the facts and the law.[1]

There are two complaints involved in the appeals at bar; Overfield's and Weigle's. Weigle's bill complains that eight purchases, described hereinafter, made by The Pennroad Corporation were consummated by it pursuant to a scheme to employ its funds for the benefit of The Pennsylvania Railroad Company to the damage of Pennroad. Overfield's complaint, prior to amendment complained of only one of the transactions complained of in Weigle's bill, that growing out of the freight forwarding project. The Weigle suit was filed on June 7, 1940; Overfield's on March 30, 1939. Jurisdiction in both suits is based on diversity of citizenship. On February 10, 1941 the District Court made an order "consolidating" both cases and proceeded to trial. Four days later Overfield asked leave to intervene as a party-plaintiff in the Weigle suit, submitting with her motion a petition asserting that she adopted the eight causes of action set out by Weigle. The court below allowed the intervention.

---

[1] The trial consumed seventy-eight trial days. The record is of unusual length. The appendix (see our Rule 25) is in excess of 10,000 pages, and most points have been briefed in extenso. This statement is offered by way of apology for the length of this dissenting opinion.

On February 28, Mr. Maurice S. Weigle, appearing on behalf of his mother, the plaintiff in that suit, testified that she did not own Pennroad stock[2] at the time of the happening of the events complained of in her bill but that she had received the stock under the will and from the estate of her father, Maxwell S. Stein, who had purchased it on August 9, 1929. It appeared that Mrs. Weigle had come into possession of the stock after September 27, 1932, a date by which all the transactions complained of, save one (if they be treated as unconnected events), had been completed. The defendant moved to dismiss the Weigle complaint on the ground that she was not a stockholder of Pennroad at the time of the occurrence of the events complained of, citing the provisions of Rule 23(b),[3] 28 U.S.C.A. following section 723c. Her counsel conceded that she was not "strictly" a proper party-plaintiff in a representative suit under Rule 23(b). The will of Mrs. Weigle's father makes no reference to Pennroad stock. It is not clear how Mrs. Weigle received the stock but she has failed to prove that she owned the shares at the time of the happening of the events complained of by her except in respect to the freight forwarding transactions which began in 1929 and which in substance was brought to an end by the sale of certain interests in 1933. Mrs. Weigle has failed also to prove that her shares devolved on her by operation of law.

Ownership of shares of stock at the time of the happening of the events complained of is required by Rule 23(b). I am of the opinion, however, that compliance with the provisions of the rule is unnecessary for the maintenance of the "real" jurisdiction of the court. This conclusion is based upon the decision of the Supreme Court in Venner v. Great Northern R. Co., 209 U.S. 24, 28 S.Ct. 328, 52 L.Ed. 666. See also Moore's Federal Practice, pp. 2275-2276. The provisions of old Equity Rule 37, 28 U.S.C.A. § 723 Appendix, requiring the intervention to be in subordination to the main proceeding has been omitted from Rule 24 of the Rules of Civil Procedure. Moreover, it is clear that under the law of Delaware which, for the reasons set forth hereinafter, governs the substantive rights of the parties, the right of every stockholder is derivative and inures to the benefit of all shareholders through the corporation. See Keenan v. Eshleman, 23 Del.Ch. 234, 2 A.2d 904, 120 A.L.R. 227. It follows, therefore, that the defect in the Weigle suit is cured by the Overfield intervention and that the court below did not commit error in refusing to dismiss the Weigle complaint.[4, 5]

---

[2] The words "stock" or "stockholder" are used in this opinion from time to time in lieu of "voting trust certificate" or "voting trust certificate holder". Actually, as will appear from this opinion, at the time of the happening of the events complained of, there were no stockholders of Pennroad other than the trustees of the voting trust as stated hereinafter. The public held voting trust certificates issued under the voting trust until the dissolution of the trust.

[3] Rule 23(b) of the Federal Rules of Civil Procedure in pertinent part provides: "In an action brought to enforce a secondary right on the part of one or more shareholders of an association, incorporated or unincorporated, * * * the complaint * * * shall aver (1) that the plaintiff was a shareholder at the time of the transaction of which he complains or that his shares thereafter devolved on him by operation of law * * *."

[4] See Pennsylvania's request No. 11 for findings of fact, found by the District Court as requested. It states that Mrs. Weigle acquired her stock in Pennroad after September 27, 1932. Note also that the court below refused Pennsylvania's request No. 13, a request to affirm a conclusion of law that Weigle's complaint should be dismissed as not in conformity with Rule 23(b).

[5] Under the view expressed it is unnecessary to determine the vexing question arising under Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, and Ruhlin v. New York Life Ins. Co., 304 U.S. 202, 58 S.Ct. 860, 82 L. Ed. 1290, as to whether the provisions of Rule 23(b) are applicable to a stockholder's derivative suit, the stockholder having acquired the stock after the time of the happening of the events complained of, when, under the law of the state of incorporation (here, Delaware) there is no such requirement as to time of ownership. See Blair v. F. H. Smith Company, 18 Del. Ch. 150, 164, 156 A. 207, 213. See also Moore's Federal Practice, pp. 2250 et seq.; Home Fire Insurance Co. v. Barber, 67 Neb. 664, 93 N.W. 1024, 60 L.R.A. 927, 108 Am.St.Rep. 716; the decision of this court in Gallup v. Caldwell, 3 Cir., 120 F. 2d 90. See as well Perrott v. United States Banking Corporation, D.C., 53 F. Supp. 953.

Mrs. Overfield asked leave to amend her complaint by including in it the other seven causes contained in the Weigle complaint not set forth in the Overfield complaint. After argument the motion for leave to amend was granted. See D. C., 39 F.Supp. 482. Questions as to the application of statutes of limitation are presented by the amendment and the interventions. It will be more convenient to discuss these questions at a later point in this opinion. Assuming that the additional causes of action now embraced in the Overfield complaint are not barred by a statute of limitations, all evidence adduced in proof of the causes of action set out in the complaint in the Weigle suit must be deemed to be equally pertinent to the issues presented by the Overfield complaint.

The complaints (after amendment of the Overfield bill) set out substantially identical causes of action. Each now refers to the eight transactions discussed hereinafter. Each contains certain general allegations as to the conduct of Pennsylvania, Pennroad's directors and the voting trustees, and though the language employed in the complaints varies slightly the substance of the allegations is the same. It is asserted that Pennsylvania at the time of the happening of the events complained of was in "complete control of every administrative, executive and managerial department, agency and office of Pennroad, including the office of Voting Trustees."[6] It is alleged that by reason of the voting trust the management, direction and control of Pennroad "was to be vested in Pennsylvania for a period of ten years." It is claimed that Pennsylvania was a fiduciary for Pennroad and that Pennsylvania's interests were distinct from and conflicted with those of Pennroad. It is asserted that the transactions complained of (described hereinafter) were a fraud upon Pennroad and its stockholders perpetrated through the wrongful exercise of dominion and control of Pennroad by Pennsylvania. It is alleged also that the directors of Pennroad named as defendants[7] participated in the fraud by conspiring with Pennsylvania to carry it out.

It is asserted further that the "Directors and Officers of Pennroad herein named as defendants" combined and conspired with each other and with Pennsylvania to suppress or conceal facts showing the true character and nature of the transactions complained of and that the plaintiffs remained in ignorance of these facts until public disclosure of them was made by the report of the Wheeler Committee in 1938.[8],[9]

Both complainants pray that Pennsylvania and the individual defendants be held to be jointly and severally liable for all the losses incurred or suffered by Pennroad because of the transactions complained of, for an accounting and for other relief.

Many of the pertinent facts are set out in the opinions of the District Court at 42 F.Supp. 586, at 48 F.Supp. 1008, and in the court's extensive findings of fact. At the request of this court, counsel for the parties compiled the findings made by the District Court, those specifically designated as "findings" by the District Judge as well as the statements as to facts contained in his opinions not designated as "findings." References are made in these compilations to the pertinent testimony. I shall refer to the findings of fact and conclusions of law made by the court below only where I deem it to be necessary.

A fundamental fact which animated all the defendants was that long before the incorporation of Pennroad (at least as early

---

[6] Quoted from paragraph 7 of the Weigle complaint.

[7] It should be noted that Mr. Joseph Wayne became a director of Pennroad on March 11, 1931. The transactions in respect to the freight forwarding project occurred after this date. All the other transactions complained of took place before Mr. Wayne had been elected to Pennroad's board. It will be noted that Mr. Wayne became a director of Pennroad before he became a director of Pennsylvania.

[8] See "Investigation of Railroads, Holding Companies, and Affiliated Companies". Senate Report No. 1182, 76th Congress, 3d Session. The report was ordered printed on February 6, 1940.

[9] The Weigle complaint is more specific in dealing with the alleged concealment of facts complaining that the directors or officers of Pennroad "surreptitiously and covertly caused, or knowingly permitted, to be omitted from the books and records of Pennroad all matters and facts showing, or tending to show any relationship or interest on the part of Pennsylvania" in respect to the transactions complained of and caused them to appear as if they had been made by Pennroad "in the exercise of the wholly independent and disinterested judgment" of the individual defendants as Pennroad's directors.

as 1924) officers and directors of Pennsylvania perceived the desirability, even the necessity, of acquiring control, or a measure of control, in other carriers in order to protect Pennsylvania's traffic revenues. A tentative plan for consolidating the railroads of the United States into systems was promulgated by the Interstate Commerce Commission in 1921[10] pursuant to the mandate of the Transportation Act of 1920.[11] By 1929 it was apparent that Pennsylvania might not obtain control of certain lines which it considered essential for the protection and augmentation of its traffic. Pennsylvania's position, like that of other trunk line railroads, was complicated further by the provisions of Section 7 of the Clayton Act, 15 U.S.C.A. § 18, prohibiting one carrier from controlling another when the effect of such control would lessen competition. Most of the officers and directors of Pennsylvania were convinced that it was necessary to guard their company by the acquisition of stock interests in "feeder" railroad lines. Pennsylvania possessed a wholly-owned subsidiary, Pennsylvania Company. This was an investment company which could have been used for the acquisition of railroad stocks. Pennsylvania Company's capital was comparatively small and because of the direct stockownership of that company by Pennsylvania and of the provisions of the Clayton Act it was incapable of real assistance to Pennsylvania.

Pennroad was selected as the appropriate instrumentality for Pennsylvania's expansion. The company was incorporated in Delaware on April 24, 1929 as an investment company with an authorized capital of 10,000,000 shares of stock without par value.

The charter of Pennroad stated as one of its purposes " * * * to aid in any manner which the board of directors may deem advantageous to the Corporation or to the holders of its stock, any corporation

or association, * * * any securities of which are held by or for the Corporation, directly or indirectly, or not less than 25% of the stock of which is held by any or all of the stockholders of the Corporation collectively." Since the voting trust certificates of Pennroad were to be offered first to Pennsylvania's stockholders it was thought by Pennroad's promoters that the holders of voting trust certificates would own more than 25% of the stock of Pennsylvania. The voting trustees would possess the legal title to all Pennroad stock. Pennsylvania, therefore, would be a corporation "not less than 25% of the stock of which" would be held by stockholders of Pennroad. Under the charter provisions quoted Pennroad could render assistance to Pennsylvania in any manner which Pennroad's directors deemed advantageous to Pennroad or to its stockholders.[12]

Officers of Pennsylvania served as incorporators of Pennroad. Directors were elected and all of those directors, save one, Mr. Henry H. Lee, were also directors of Pennsylvania. Mr. Lee resigned as Pennsylvania's treasurer to become Pennroad's president. The directors proceeded immediately to elect officers. All persons elected as officers had been or were officers or employees of Pennsylvania. A voting trust was set up. The voting trust indenture provided that there should be three voting trustees. Three voting trustees were selected. One of them was General William Wallace Atterbury, president of Pennsylvania. Another was Mr. Effingham B. Morris, a director of Pennsylvania and chairman of the finance committee of Pennsylvania's board of directors. The third was Mr. Jay Cooke, a director of Pennsylvania and chairman of the road committee of the Pennsylvania board.[13] All of Pennroad's stock was included in the voting trust.

The control and dominion which Pennsylvania expected to exert in respect to

---

[10] See Consolidation of Railroads, 63 I. C.C. 455.

[11] See Section 406 of the Transportation Act of 1920, 41 Stat. 481, 49 U.S.C.A. § 4. A convenient index of railroad companies as allocated under the Interstate Commerce Commission's consolidation plan may be found in Moody's "Steam Railroads" for the years after 1921.

[12] Pennroad would have possessed such power without specific charter authorization since one corporation may aid another. The purpose of the charter provision quoted avowedly was to give notice to the investing public of the purpose for which Pennroad had been incorporated.

[13] By Pennroad's charter its directors were divided into three classes, each class consisting of one-third of the board. One-third of the directors came up for reelection at each annual meeting. At each annual election directors were chosen for a term of three years.

Pennroad and the means by which it intended to achieve this end are exhibited by a statement accompanying drafts of Pennroad's proposed charter and by-laws sent on April 18, 1929 by Mr. Albert J. County, a director of Pennsylvania and its vice-president in charge of treasury, accounting and corporate work, to Mr. Morris. In this statement Mr. County said: " * * * for the protection of the company to prevent losing control, especially in the early days under a diversified ownership, a voting trust seems the only way. * * * The voting trustees would be our own people. The first directors of the corporation suggested would be our finance committee, including General Atterbury and myself."

Invitations to subscribe to Pennroad's stock were mailed to all stockholders of Pennsylvania and General Atterbury joined Mr. Lee in sending a communication to the stockholders of Pennsylvania suggesting the purchase of Pennroad stock. General Atterbury's letter included the following statement: "Your [Pennsylvania] directors have given earnest consideration to recent developments in the field of transportation, and have reached the conclusion that it will be of material advantage to this Company and its stockholders, for the stockholders to unite in establishing a corporation so organized that it may make investments and take advantage of opportunities on a much broader basis than is possible under the limited powers of a railroad company. Your Directors are of the opinion that such an independent instrumentality is needed to protect your interests and those of your Company." Of the original issue of Pennroad stock 4,506,606 shares or 81.13% were acquired by persons who held 6,376,971 shares or 56.64% of the stock of Pennsylvania. By reason of these facts Pennsylvania came within the category of corporations designated in Pennroad's charter 25% of whose stock was held by the stockholders of Pennroad.

Immediately upon the incorporation of Pennroad it embarked upon the first of the eight transactions complained of. These are described immediately hereinafter in the paragraphs numbered (1) to (8), inclusive.

(1) *Detroit, Toledo & Ironton Railroad Company.* The incorporation of Pennroad was rushed to completion so that it might purchase the securities of this company.[14] The purchase price was approximately $35,500,000. DTI runs from Detroit to Ironton on the Ohio River and thence to Toledo, a distance of about 350 miles. It connects with Norfolk & Western Railway in which Pennsylvania owned a substantial stock interest. About 85% of DTI's traffic moved to and from Detroit. In 1920 Mr. Henry Ford purchased most of DTI's securities, paying $1 a share for the common stock, $5 a share for the preferred stock, and purchasing the company's first mortgage bonds at $60.[15] He constructed a 13-mile extension to the River Rouge plant of the Ford Motor Company and built an interchange yard at Flat Rock, Michigan, to handle Ford traffic, and a new line from Petersburg to Malinta. The maximum investment made by Mr. Ford did not exceed $23,000,000.[16] The record demonstrates that without the Ford traffic the road would have operated at a deficit.

Pennsylvania showed marked interest in DTI before 1928. In February 1928 Mr. Edsel Ford sent for Mr. S. T. Stackpole, the general-agent of Pennsylvania at Detroit, and stated to him that he and his father would like to sell the railroad. Extended negotiations followed. Numerous reports were made by Pennsylvania officials and experts to Pennsylvania. Ownership of DTI would be of advantage to Pennsylvania if there was assurance that DTI would continue to carry Ford traffic. On March 8, 1929, Mr. County stated in a letter to General Atterbury that Pennsylvania would not risk $39,000,000 in purchasing DTI "except on a firm contract with Ford and with the I. C. C.'s approval." Mr. County had discussed with Kuhn, Loeb & Co. the question of marketing DTI bonds to the public. Mr. Mortimer Schiff of that banking firm had stated that a

---

[14] The plaintiffs assert that Pennroad in reality bought the railroad; that it did not possess the power under its charter to own or operate a railroad as distinguished from the owning of securities of a railroad company. It is not necessary to discuss this point.

[15] It is unnecessary to describe or to refer to the various corporate entities created by Mr. Ford in connection with his ownership of DTI.

[16] The total Ford investment was estimated $22,172,889 in a preliminary report on DTI made by a committee of Pennsylvania officials for the executives of Pennsylvania when Pennsylvania itself was considering the purchase of DTI.

syndicate would not be interested in marketing the bonds without a guarantee by the Fords that traffic from and to the River Rouge plant would continue to be carried by DTI.

An agreement had been drafted by Pennsylvania officials to be used for the DTI purchase, the name of the purchaser being left blank. One such draft was known as draft "#4." Written on it in Mr. County's handwriting is a memorandum dealing with the financing of the proposed purchase. The memorandum is set out in the margin.[17] Attention is called to the phrase, "Use the Pennroad Corp." The initials "G. H. P." appearing on the memorandum refer to Mr. George H. Pabst, Jr., who had succeeded Mr. Lee as treasurer of Pennsylvania. The memorandum was written about April 22, 1929, two days prior to Pennroad's incorporation. Pennsylvania intended that $15,000,000 of the purchase price should be paid to the Fords by April 30, 1929. On April 29, 1929, five days after Pennroad's incorporation, Mr. County wrote to Mr. Lee transmitting reports and data on DTI, stating, "As Pennsylvania Company did not wish to make the purchase of this property, I am hopeful that your Corporation, will do so and at an early date, because the question has been so long delayed that the Ford interests demand that prompt action must be taken or they will deal with other parties." On April 29th Pennroad borrowed $15,000,000, for the purpose of making the payment referred to.

Pennsylvania's negotiations with the Fords suddenly were broken off. Mr. Henry Ford would give no guarantee that he would continue to make use of the DTI for Ford traffic. He would not accept a partial payment. On June 25, 1929, however, the purchase of DTI was consummated in a simple form. As has been stated Pennroad paid approximately $35,-500,000,[18] and received all of the DTI securities owned by the Fords. There was no guarantee of continuation of Ford traffic. On the completion of the sale one of Pennsylvania's representatives in Detroit telephoned Mr. County and told him that the purchase had been consummated. Neither Mr. Lee, the president of Pennroad, nor Mr. Samuel H. Ogden, its vice-president, took any part in the DTI negotiations. Mr. Ogden testified: "The Pennroad Corporation * * * made no * * * examination [of the merits of the purchase] because of the conditions that existed at that time * * * there was practically no opportunity to do so. As I testified, it was my opinion that The Pennroad Corporation was formed * * * to immediately acquire the securities of the Detroit, Toledo & Ironton Railroad Company." No executive officer of Pennroad attempted to estimate the amount of the return on the company's investment until after the purchase had been made. The amount expended was about 44% of Pennroad's total authorized capital. Despite this fact Pennroad's board did not authorize the purchase of DTI until the purchase had been made.

An assistant-treasurer of Pennsylvania, Mr. H. W. Schotter, reviewed the DTI transaction in order to recommend a financial basis for setting up the investment on Pennroad's books. He selected 8% as an appropriate return, showing that he deemed the investment to entail risk. The sale price which the Fords obtained was based apparently on average earnings of DTI "over recent years" in the amount of $2,-160,000, capitalized at 6%. The Fords could assume that their traffic would be carried on their own railroad. Pennroad, however, was not entitled to make such an assumption.

The independent experts appointed by the District Court[19] reached the conclusion that DTI was worth $48,000,000 to the Fords on the basis of income returns. These returns included both the income received from the operation of the railroad and interest on

---

[17] As follows: "Rewrite of #3. Mr. County's copy. G. H. P. Use The Pennroad Corp. Use two contracts,

"1. Covering the stock & let the Pennroad officers act for it. The First Natl. Bk. will not be in this.

"2. Covering the bonds in which the First Natl. of Detroit is to be a party. Can't we provide to take the bonds by degrees for Pennroad Corp.

*      *      *      *      *      *

"A. J. C."

[18] Subject to certain adjustments which need not be detailed here. The net price paid to the Fords was approximately $35,-499,000. Pennroad purchased additional securities issued by DTI. The "overall" purchase price amounted to approximately $37,500,000.

[19] See 48 F.Supp. at page 1009.

the securities held by the Fords. The figure given by the experts seems too high. See the comparative balance sheets of DTI given by Moody's "Steam Railroads" for the years 1929 and 1930. Totalling net income and accrued interest and using $37,500,000 as a basis,[20] the average return to the Fords for the years 1921 to 1928, inclusive, was at the rate of about 4½%. Making use of the figure of $37,500,000, the percentage of net income plus accrued interest on the outstanding obligations of DTI was at the rate of 12.03% for 1929, 8.70% for 1930, and 2.68% for 1931. The average of the three years was 7.804%. For the years 1932 to 1940, inclusive, the average was 5.2%. Averaging the returns from 1929 to 1940 inclusive, we find the average to be 5.85%. Since Pennroad did not own approximately $2,000,000 face value of the securities of DTI the return to it was less than this average over the twelve years from 1929 to the date of the trial. Precisely what the return was may be ascertained on an accounting.

The independent experts appointed by the court found Pennroad's investment in DTI to be an excellent one. I cannot so characterize it since it was subject to the risk that the Fords might move their traffic to and from the River Rouge plant by some other railroad. Pennroad made the investment because Pennsylvania compelled it to do so and for no other reason. Pennroad's board and its executive officers made no investigation of the value to Pennroad of DTI. They accepted the risks which Pennsylvania imposed upon their corporation. The liability of the defendants by reason of their conduct and the liability of Pennsylvania as well as the applicable measure of damages will be discussed hereinafter.[21]

(2) *Canton Company of Baltimore.* On June 10, 1929, Pennroad purchased 21,975 shares[22] of the stock of Canton Company of Baltimore for $13,432,817. This price was slightly in excess of $611 per share. Canton owns Canton Railroad Company which operates a terminal railroad thirty-three miles in length in and about Baltimore. Canton Railroad connects with Pennsylvania, with the Western Maryland and with the Baltimore & Ohio. Canton

Company also owned about 1,350 acres of land. About 200 acres had been improved by the building of warehouses, wharves, and piers. These lands were leased to Canton Railroad. Pennsylvania desired to prevent the control of Canton Railroad from falling into the hands of any competing trunkline. As appears from a letter of September 6, 1927 written by Mr. Charles S. Krick, vice-president of Pennsylvania, Eastern Region, to Mr. Martin W. Clement, vice-president of Pennsylvania in charge of operations, control of Canton by Pennsylvania would result in Pennsylvania receiving 60% of Canton Railroad's business instead of 43%, resulting in a net increase of freight revenue to Pennsylvania of about $577,000 a year.

On July 5, 1928 Mr. County wrote a letter to Mr. Jerome Hannaur, a member of the firm of Kuhn, Loeb & Co., stating that he had conferred "with some of our friends as to the value of the [Canton] property, and they say the outside figure is $11,000,000, * * * that this amount could not be realized except within a long period because it must arise in large part from future profits from real estate as the latter becomes in demand during the years to come. From $11,000,000 we should deduct the $1,500,000 of [outstanding] bonds, leaving [a net value of] $9,500,000." In this letter Mr. County made it plain that he thought Canton's stock was worth about $432 a share. About this time Mr. Thomas W. Hulme, vice-president of Pennsylvania in charge of real estate, valuation and taxation, wrote to. General Atterbury that "While the Canton is paying $8 a share in dividends, most of it comes from the sale of property. Its railroad and terminal operations are conducted without profit. * * *"

In 1928 Pennsylvania ceased negotiating for Canton because of the price demanded for the stock, about $600 a share, and also because its acquisition by Pennsylvania would require the approval of the Interstate Commerce Commission. Following a meeting on May 27, 1929 of General Atterbury with the vice-presidents of Pennsylvania, the following memorandum was written: "At the President's Conference yesterday, the question of purchasing the

---

[20] The figure last mentioned includes all securities including the few not owned by the Fords and purchased by Pennroad.

[21] The District Court imposed no liability on Pennsylvania in respect to the DTI transaction. His reasons for not doing so appear in the opinion at 48 F.Supp. at page 1008.

[22] This was substantially all of Canton's stock.

Canton R. R. of Baltimore came up. Mr. County stated that the lowest price he could obtain was $700 [sic] per share or $15,400,000 for the entire property. The consensus of opinion was that while the Pennsylvania Railroad should have the Canton Railroad, we would not be warranted in paying this price." On June 4, 1929 it was decided, that Pennroad should purchase Canton. On that day Mr. County took a previously prepared letter to the office of Mr. Theodore H. Banks, president of American Securities Exchange Corporation, brokers. The letter was dated June 10th. Signed by Mr. Banks it was addressed to Mr. James C. Colgate and all other owners of Canton's voting trust certificates, and contained an offer to buy any or all the stock or voting trust certificates of Canton at $596, a share. Financial statements of Canton, and supporting data had been sent to Pennroad on June 5th. Pennroad purchased the Canton stock on June 10 without an authorizing resolution by its board of directors.[23] More than a year later, Pennroad asked Canton for maps showing "available unimproved property owned by the Canton Company, with its area, streets, whether cut through or not, available siding connections, and like information." Pennroad apparently was not in possession of this vital information when it made its purchase.

In 1929 profits to Canton from the sale of real estate amounted to about $690,000; in 1930, to $93,487; in 1933, to only $1,259. In 1929, the most profitable year Canton Railroad had had, its net operating revenue was only $323,401, amounting to less than 3% on Pennroad's investment.

Because of the amount of real estate held by Canton the court's experts encountered difficulty in arriving at the amount of Pennroad's losses from this venture and suggested that Pennsylvania be compelled to take over Canton from Pennroad at its cost to Pennroad. The purchase of Canton stock by Pennroad was in fact a real estate speculation, a speculation which could result in benefit only to Pennsylvania.

The District Court refused to give any judgment in favor of Pennroad because of the Canton purchase concluding that there was "grave doubt as to whether any real damage has been suffered by Pennroad from its Canton Co. investment, [in the light of] failure of the complainants to clearly establish a basis of damage suffered as a result of defendant's [Pennsylvania's] breach of trust, [and] it does not seem essential that the Chancellor should * * * make an award based upon the Canton Co. purchase." See 48 F.Supp. at page 1012. The fact that Pennroad suffered damage is apparent. Aside from the fact, which I have already commented on, that Pennroad was compelled to embark on a real estate speculation, inappropriate for any investment company, it is clear that Pennroad paid more than the stock was worth. No share or voting trust certificate of Canton had sold on the Baltimore stock exchange for a price in excess of $400. Most sales were at prices substantially below the price stated. The City of Baltimore which then appraised for tax purposes real estate at substantially 100% of value, had appraised Canton's properties at $6,184,719 for the year 1929 and at $7,100,200 for 1940. A Haskins and Sells report of June 15, 1929 showed a very substantial deficit in surplus. The returns to Pennroad indicate a value far below the price paid. These factors among others should be employed in arriving at the amount of Pennroad's loss. The District Court should make a specific finding as to the value of the stock at the time Pennroad bought it. The findings made by the District Court are without support in evidence.

(3) *The Pittsburgh & West Virginia Railway Company.* This transaction may be treated more briefly than the two previous purchases. About September, 1929, General Atterbury obtained information that shares of stock, representing the control of PWV and owned by Mr. Frank Taplin, of Pittsburgh, were for sale. A special meeting of the board of directors of Pennroad was called and held on September 5.[24] A resolution was adopted which authorized Pennroad to purchase about 220,000 shares of PWV at a price not to exceed $175 a share. At the next regular meeting of Pennroad's board, six days later, General Atterbury informed the directors that Mr. Taplin had agreed to sell his stock for $170 per share. Pennroad then purchased Taplin's stock, constituting 73% of

---

[23] A resolution authorizing the purchase was passed on June 12.

[24] The president of Pennroad, Mr. Lee, and Mr. County were not present at this meeting.

the total outstanding stock of PWV, for $37,898,100. Subsequently, Pennroad bought a small number of additional shares of stock in the open market.

PWV runs from Pittsburgh to a junction with the Wheeling & Lake Erie in the west and from Pittsburgh to a junction with the Western Maryland in the south. PWV also owns a terminal railroad, West-Side Belt Railroad Company of Pittsburgh. Along the tracks of West-Side lie mines owned and operated by Pittsburgh Terminal Coal Company. About 75% of the coal traffic of PWV (at least 50% of all its traffic) originated with Pittsburgh Terminal. By 1927 the production of coal and consequently the net income of Pittsburgh Terminal had declined abruptly. The company incurred deficits in 1927 and 1928. When Pennroad purchased the PWV stock, Pittsburgh Terminal had only five mines in operation. PWV's financial structure was complicated by the fact that PWV had owned Pittsburgh Terminal and, while owning it, had guaranteed payment of principal and interest of bonds issued by Pittsburgh Terminal. In face amount, these exceeded $2,500,000. By 1927 PWV's working capital showed a deficit of $743,000.

It was proposed by those in control of PWV that it be constituted a central part of a new route from tidewater at Baltimore to the Great Lakes. In pursuance of this plan, PWV had engaged in a struggle with certain railroad systems to control the Wheeling and Lake Erie by purchase of its stock. In this struggle PWV had incurred indebtedness which amounted to $1,700,000 in September, 1929. PWV also had obligated itself to build an extension, known as the "Connellsville" extension, to connect it with the Western Maryland. In 1928 and 1929 PWV issued $6,000,000 of bonds to finance the extension. This sum was insufficient and it was apparent that PWV would have to raise as much more to complete the new line. On the other hand it was obvious that with the Connellsville extension completed PWV would constitute an important element of the Baltimore-Great Lakes route. In fact when the extension was put in operation in 1931 the number of loaded cars interchanged with the Western Maryland at Connellsville was 10,518 and by 1940 this number had increased to 54,459. The increase in interchange was due largely to new traffic in carrying iron ore from the Great Lakes. This traffic was diverted to PWV from Pennsylvania, from the Baltimore & Ohio, the New York Central Railroad Company, and the Bessemer and Lake Erie.

It is unnecessary to discuss the controversy existing between Pennsylvania and certain other trunk railroads under the so-called "Four-System Plan" for the eastern railroads or what may be described as the Taplin "Fifth-System Plan." There were clear and cogent reasons for Pennsylvania's desire to prevent interests dominated by the Van Sweringens from obtaining control of PWV[25] and for Pennsylvania's desire to have Mr. Taplin's stock in friendly hands.

The defendants lay emphasis on the fact that PWV paid dividends at the rate of $6 per share from 1927 to 1929 inclusive. During these years, however, as was pointed out by the experts appointed by the court, after paying fixed charges and dividends, PWV retained less than 5.9% of its earnings for addition to surplus. The experts, using as a test the practices of thirteen representative American railroads, concluded that in each of the years referred to PWV should have put at least $1,600,000 into its surplus accounts. They stated, "Such a course would have permitted dividends of less than $5 per share for each of the three years instead of the $6 paid." Making generous allowance for the success of the Connellsville extension, not completed at the time of the Pennroad purchase, the experts estimated the average net earnings of the railroad as amounting to $3,777,000. Capitalizing this amount at 6.26%,[26] the experts arrived at a gross value for PWV slightly in excess of $60,-000,000. Deducting the estimated debt of about $20,000,000 from this and dividing the net by the total number of outstanding

---

[25] The Interstate Commerce Commission stated the gist of the matter in granting the application of the PWV to construct the Connellsville extension when it said: "The proposal [the Connellsville extension] raises the question as to whether the port of Baltimore should be served merely by two competitive systems, the Pennsylvania and the Baltimore & Ohio, or should be served also by a third system, competing with both the others." See Proposed Construction of Extension by Pittsburgh & West Virginia Railway Company, 138 I. C.C. 755, 762.

[26] A capitalization figure employed by the experts and based on the earnings of the thirteen representative railroads in relation to 1928 stock prices.

shares; viz., 302,351, they arrived at a value per share of PWV stock of about $129. This did not include the value of the stock of the Wheeling and Lake Erie owned by PWV. But, although the Wheeling and Lake Erie had substantial earnings, dividends were being paid only on its prior lien preferred stock and PWV owned less than 46 shares of this stock.

In September and October, 1928, 60,000 shares of PWV had been traded in on the New York Stock Exchange and the price range fluctuated between a low of 145¾ and a high of 163. By May, 1929, both volume and price had fallen off and in that month fell so that only 5,400 shares were traded in at a price range of 125⅝-135¼. It appears also that in May Mr. Taplin and some of his associates formed a trading pool and the market activity and price of the stock momentarily increased.[27] Thereafter the price of PWV stock declined contrary to market trend for railroad stocks. The PWV stock bought by Pennroad was worth not more than $129 a share when Pennroad purchased it, $41 less than the price paid. The difference amounts to $9,140,130. The District Judge imposed this liability upon Pennsylvania. See 48 F. Supp. at page 1011. The learned District Judge found that the purchase by Pennroad of the PWV stock was "induced by Pennsylvania Railroad" for the same reasons as induced the purchase by Pennroad of the stock of Detroit, Toledo & Ironton, viz., to bring PWV "into the sphere of influence of Pennsylvania lines." [42 F.Supp. 625.] This finding is supported abundantly by the evidence. The District Judge did not include in the damages underwriting commissions paid by Pennroad in connection with the PWV transactions. These amounted to $5,281,586. The total cost to Pennroad was increased by this amount. Pennroad purchased the stock because Pennsylvania wanted to control PWV. Uninfluenced by Pennsylvania I cannot conceive that Pennroad's directors would have made the purchase.

(4) *Seaboard Airline Railway Company.* In October, 1929, Pennroad purchased 402,119 shares of Seaboard stock for a price of $4,523,838. The circumstances surrounding this purchase may be stated briefly as follows. In November, 1927, Mr. Walter W. Colpitts, a railroad engineer, was asked by the Seaboard management to study Seaboard properties and to recommend improvements. A report was submitted by Mr. Colpitts to the Seaboard management in May, 1928. The report showed that Seaboard had permitted some deterioration to take place in its lines and equipment. Seaboard was largely a single track railroad constructed of light weight rails. The road-bed was inferior; approaches were made of wood and many of these were old. Seaboard also possessed excessive grades. About 40% of its trackage lay in the State of Florida and the remaining trackage served the coastal plains east of the Appalachians. This land was largely agricultural. Seaboard competed with other large railroad systems lying in the South. These had direct access to the Gulf ports and south-western gateways. Seaboard was in direct competition with the Atlantic Coastline Railway. The Colpitts' report states, "The Seaboard and the Atlantic Coastline are perhaps as competitive as any two railroads in the United States."

The Atlantic Coastline was much the stronger of the two railroads. Seaboard's dividend record was bad. So far as this record discloses, it had never paid dividends on any stock. Its net income, however, did show some improvement from 1921 to 1926. As Mr. County put it, "Seaboard went so far as to earn something on its common stock [in 1927]." Net income available for the payment of dividends in 1927 amounted to less than $32,000. In 1928 there was a $70,000 deficit. In 1929 the deficit was $238,000. Seaboard's annual report for the year 1928 showed funded indebtedness of over $192,000,000. Seaboard's outstanding preferred and common stocks in face amount exceeded $60,000,000. The outstanding preferred totalled nearly $24,000,000. Moody's Manual of Railroad Securities graded Seaboard's common stock at the low rating of "Ca." Seaboard's bonds sold

---

[27] The court found the following, 48 F. Supp. at page 1010:

"As to the Pittsburgh & West Virginia investment, it will be recalled that at the instance of the railroad president, who was also a director of Pennroad, the latter company authorized the purchase of 220,000 shares at $170.00 per share in pursuance of an agreement previously reached with the principal stockholders of P. & W. Va. stock. The facts disclosed at the trial, and the experts also found, that pools had been operated, and a reckless dividend policy followed, for the purpose of influencing the market price of the stock, and that therefore the market quotations formed no accurate basis of value."

below par between 1924 and 1929. The railroad had maturities coming due in 1933 of over $38,000,000 and according to the Colpitts' report Seaboard needed about $32,000,000 for permanent improvements before 1932. The railroad was close to insolvency.

A syndicate known as "Securities Syndicate" had been formed to rescue Seaboard. Mr. Ralph H. Bollard, vice-president of the brokerage house of Dillon Reed & Co., brokers among others for Pennsylvania, was active in forming the organization. Dillon Reed & Co. served as one of the managers. General Atterbury became a member of the syndicate in February, 1929, obligating himself to a participation of $100,000. The participations totalled $9,-360,000. The objective, as Mr. Bollard testified, was "to reorganize the finances of the Seaboard Airline Railway Company in the hope that the affairs of the company would be put on a stronger financial basis." The syndicate worked out a plan for Seaboard's reorganization. The syndicate deemed it essential that Seaboard obtain at least $20,000,000 in new money. To assure Seaboard's obtaining this sum Dillon Reed & Co. and others underwrote 1,892,630 shares of new common stock to be sold at $12 a share. An underwriting commission of 75¢ a share was arranged for all participants. Dillon Reed & Co. became entitled to an additional commission of 25¢ a share for their services as managers. It was conceded by the syndicate that Seaboard would soon need further financing and that the reorganization proposed by the syndicate was an expedient made necessary by Seaboard's dire financial position. It was thought that the new common stock might earn as much as 45¢ a share. No higher return could be expected.

On October 9, 1929 Pennroad's directors voted to sell $3,800,000 worth of government bonds, yielding 5⅛%, and authorized Pennroad's officers "to carry fully into effect arrangements with Messrs. Dillon Reed & Co. and associates, upon the general terms of a memorandum submitted to this meeting with respect to new stock proposed to be issued by the Seaboard Airline Railway Company." On the same day Pennroad executed an agreement to underwrite the underwriting of Dillon Reed & Co. and other members of the syndicate to a maximum of 25% of all the new common stock, viz., a total of 473,157½ shares. Pennroad became entitled to obtain 125,000 shares if so many were available to the original underwriters from stock not purchased by the public. Pennroad was to receive an underwriting commission of 75¢ a share.

It will be apparent immediately how extraordinary these arrangements were. If Seaboard and the syndicate had no difficulty in disposing of the stock by sales to the public, Pennroad might not get 125,000 shares. If the public was not interested in the venture (and it was not), Pennroad would have to buy more than 125,000 shares of Seaboard's new common stock. Eventually Pennroad had to purchase 402,119 shares, 20% of the total stock offering and 85% of Pennroad's maximum commitment.

It is interesting to observe that at the time Pennroad entered into its underwriting agreement with Securities Syndicate, no underwriting syndicate had actually been formed. This took place two days later. More extraordinary still, Pennroad actually was not free to dispose of its holdings of Seaboard common until September 30, 1930,[28] though this fact does not appear from any contract which Pennroad signed. Pennroad was exposed to great risks in a speculative underwriting for a prospective profit of 75¢ a share. It risked $4,500,000 to gain $350,000. If Seaboard's reorganization had been successful, the stock which Pennroad purchased might have paid Pennroad dividends not in excess of 45¢ a share a year. The adventure failed and Seaboard entered receivership.

The purchase was made because Pennsylvania desired an interest in Seaboard. Pennsylvania desired to secure the southern gateways through which its traffic flowed.

The learned District Judge found in respect to this transaction: "Under the underwriting arrangement Pennroad acquired 402,119 shares of Seaboard at a total cost of $4,523,838.75. There being no justification for finding that such purchase was even a reasonably sound investment made voluntarily by Pennroad for its own purpose, we conclude that it was made under the domination and at the instance of the

---

[28] The agreement not to sell Seaboard common was an oral agreement and probably ultra vires. See the letters to and from Mr. Samuel H. Ogden, vice-president of Pennroad, and Mr. Alfred S. Weill of Messrs. Weill, Blakely & Nesbitt, written in the period from October 5 to October 16, 1933. Pennroad felt itself bound by its commitment.

[Pennsylvania] Railroad in accordance with the general scheme and purpose previously described, and that the whole of the purchase price must be charged to the defendant as one element in the measurement of its total financial liability. The amount, however, must be reduced by the sum received by Pennroad's sale of Seaboard stock, to wit, $73,686.71, and the net charge to the defendant is therefore $4,450,152.04." [48 F.Supp. 1014.] The District Court in its decree allowed as damages the sum last mentioned.

The findings of fact made by the court below in respect to the Seaboard transaction find full support in the record.

(5) *Lehigh Valley Railroad Company.* On November 18, 1929 Pennroad purchased 10,000 shares of the stock of Lehigh Valley Railroad Company at a price of $65 a share. The price paid by Pennroad was below the market price. Among all the stocks purchased by Pennroad at the instigation of Pennsylvania complained of by the plaintiffs, this is the only one which may be deemed to have constituted a sound purchase for an investment company. None the less, the purchase resulted in a loss to Pennroad. Pennroad sold 8,200 of the shares for $192,274.50 and retained the balance. The shares remaining in Pennroad's possession were worth $2.75 a share at the time of the trial. The net loss to Pennroad was about $450,000.

The circumstances which brought about the transaction are typical of Pennsylvania's relations with Pennroad. General Atterbury and Mr. County were in Buffalo, New York. Mr. County learned of 10,000 shares of Lehigh Valley stock which were being offered by a "distressed" owner. He conferred with General Atterbury about the desirability of having Pennroad purchase the stock. They telephoned Mr. Lee and the latter got in touch with the members of Pennroad's executive committee. Mr. County testified that he said to Mr. Lee, " 'Now, myself and Atterbury approve this thing, get in touch with these people [the members of Pennroad's executive committee] and see if you can carry it out." Pennroad's disbursing officer paid out $650,000 of Pennroad's money without the authority of the board of directors. The purchase was made at the instigation of the two individuals who were most potent in directing Pennsylvania policies. It should be observed also that by the end of 1929 Pennsylvania Company, Pennsylvania's wholly owned subsidiary, had acquired a large amount of Lehigh Valley stock.

(6) and (7) *New York, New Haven & Hartford Railroad Company, and Boston and Maine Railroad.* Pennroad purchased 98,800 shares of the common stock of New Haven between July 31 and October 1, 1929 at a cost to it of $12,129,008.75 and purchased an additional 50,000 shares between May 6 and June 26, 1930, at a cost of $5,-172,842.50. The average price per share of the first block purchased was $122.76; while that of the second was $103.45. Pennroad also purchased 168,283 shares of the common and preferred stock of Boston and Maine between July 18, 1929 and March 15, 1930 at a total cost of $20,448,950.92. It also purchased 33,104 shares of Boston and Maine's voting stocks between January 23 and June 8, 1931 at a cost of $3,188,757.-46. Pennsylvania was interested in the New Haven and in Boston and Maine long before these purchases were made by Pennroad. It is desirable to state briefly the reasons for this conclusion.

In May, 1923, President Samuel Rea of Pennsylvania, appearing before the Interstate Commerce Commission, objected to a tentative plan of consolidation of New England railroads and laid emphasis on Pennsylvania's interest in both the New Haven and the Boston and Maine. The Commission had proposed a plan for consolidating the New England railroads into a separate system but the Boston and Albany Railroad was not to be included in the consolidation. The Boston and Albany had been leased to the New York Central for 99 years. Not including it in the consolidated system would have put Pennsylvania at a disadvantage if the new system consolidation plan had been effected. As General Atterbury stated later the Boston and Albany lay "like a spear" through rich Pennsylvania "feeder" territory. A letter from Mr. County to Judge Clarence B. Heiserman, General Counsel of Pennsylvania, in July, 1929, shows Pennsylvania's acute interest in the New England carriers. Mr. County stated in part: "Our position has been that in the creation of a single New England system the New York Central should give up its interest in the Boston & Albany Railroad, and allow that Line to be merged wth the other New England Lines, or that if the New York Central holds the Boston & Albany, we should be permitted to continue our traffic relations in New England through the assignment to us of

the New Haven * * *." General Atterbury emphasized Pennsylvania's interest in the New Haven and the Boston and Maine to the New England Railroad Committee, appointed by the New England Governors. He stated that as of April 3, 1930, Pennsylvania itself owned 204,000 shares of the New Haven Railroad; that Pennroad owned approximately 100,000 shares of New Haven and 168,000 shares of Boston and Maine. General Atterbury said: "The Pennsylvania Railroad desires a closer association with the New Haven. We started to buy the New Haven stock when it was down and it has proven a very profitable investment to us. The Boston and Maine Railroad stock we bought at relatively low prices, and then the earnings began to go up so that I think in time [that] will prove a very profitable investment to The Pennroad Corporation."[29]

The court below found[30] that "the purchases by Pennroad of stock of * * * New Haven & Hartford, and Boston & Maine were made in furtherance of the plans and under the domination of Pennsylvania Railroad to bring a closer affiliation and operating alliance of those roads with Pennsylvania Railroad through the co-operative ownership of its instrumentality, Pennroad. The primary objectives sought by such purchases were the benefit to be derived by Pennsylvania Railroad through the extension of its influence into the fields in which said roads operated, the procuring of freight traffic from such sources and the prospective assurance of friendly management for the continuance of friendly co-operation with Pennsylvania Railroad."[31] This finding is supported fully by the evidence.

The learned District Judge imposed no damages on Pennsylvania because of Pennroad's purchase of the New Haven stock. He imposed damages of $1,271,983 on Pennsylvania because of the purchase of the Boston and Maine stock. The experts appointed by the court stated, "In our opinion the loss suffered by Pennroad on its purchases of New Haven securities were not due to purchases at excessive prices under the conditions existing at the respective times of such purchases but resulted from the general changes which subsequently took place." This is the apparent basis of the refusal of the court below to assess damages for the New Haven stock transactions. The plaintiffs have devoted many pages of their brief to an elaborate calculation of losses which they assert were caused to Pennroad because of its purchase of New Haven stock. Under the view which I take of the case at bar it is unnecessary to deal with these calculations, for I think it is clear that Pennroad's directors bought the New Haven stock to benefit Pennsylvania and without regard to the benefit or detriment which Pennroad might incur.

Pennroad purchased much of the stock of the Boston and Maine at a premium. The District Court found the prices paid for it took into account prospective benefits expected to be derived by Pennsylvania.[32] The proof shows that Pennroad bought Boston & Maine stock in order that Pennsylvania might have voting power in an important New England railroad system. The District Court imposed damages of $1,271,983.88 on Pennsylvania by reason of Pennroad's purchase of Boston and Maine stock. The court decided, basing its conclusions on the report of its experts, that the average price of $112.50 would have been a fair price for the common whereas Pennroad paid $130 a share; that no liability should be imposed by reason of Pennroad's purchase of certain shares preferred stock since these shares had been purchased "within a reasonable price range"; and that as to certain other preferred stocks, the costs charged to Pennroad insofar as they exceeded 5⅝% should be reimbursed by Pennsylvania to Pennroad. See 48 F.Supp. at page 1015.

(8) *The National Freight Company.* In 1928 Pennsylvania became interested in the business of the freight forwarder.[33] A

[29] At a subsequent hearing before the New England Railroad Committee, General Atterbury was asked why Pennroad was formed. He replied, "Because there were certain investments which should be made that we were not able to make through our own direct company." He was then asked, "Is that the only reason?" He replied, "The only reason so far as I know."

[30] Finding No. 33 in the opinion in 42 F.Supp. at page 625.

[31] The finding quoted also referred in like terms to the purchases of the stocks of Seaboard and Lehigh Valley and of Boston and Maine.

[32] 34th Finding of Fact. See 42 F.Supp. at page 625.

[33] For a description of the business of the freight forwarder see Export Shipping Co. v. Wabash R. Co., 14 I.C.C. 437, 441.

freight forwarder collects less-than-carload shipments from consignors and combines them into carload lots. These are delivered by rail carriers and are on delivery distributed to the consignees. Since a higher freight rate may be charged for shipments of less-than-carload than for carload shipments, the difference in freight rates gives a margin of profit. Prior to 1929 most of Pennsylvania's forwarding business came through Universal Car Loading & Distributing Company, a wholly owned subsidiary of United States Freight Company. In 1928 Pennsylvania purchased 35,000 shares of the stock of United States Freight Company. In 1928, as Mr. County testified, it suddenly appeared that the Universal Company "which had been giving * * * [Pennsylvania] this splendid business * * * had sold a large portion of its stock to the New York Central Company, or one of its subsidiaries * * *." Control of Universal had passed to the New York Central. Pennsylvania then considered operating a freight forwarding service for its own lines, a service as Mr. County said, "that nobody's ownership of stock could disturb." General Atterbury ordered certain officers of Pennsylvania to prepare a plan for Mr. County's consideration. Difficult legal questions arose for if Pennsylvania was to be its own freight forwarder it might be classed as a shipper and it was doubtful if a carrier by railroad could engage legally in such a business.

Against this background, on June 12, 1929, the directors of Pennroad passed the following resolution: "The matter of the formation of a freight forwarding company whose stock would be held in whole or in part by this corporation was discussed as a necessity, especially for the Eastern Railroad Territory: Whereupon * * * [it was] Resolved that the proper officers are hereby authorized to proceed with the formation of a Company to be known as The National Freight Company * * *." The company was incorporated, owned and financed by Pennroad which thereby embarked on the highly competitive business of the freight forwarder far removed from the usual field of an investment company.

It had been estimated that about $800,000 would be necessary to finance Pennroad's freight forwarding project and that approximately $50,000 a month would be required to operate it; that the enterprise would be a profitable one if 30,000,000

pounds of freight were shipped a month. The inaccuracy of the estimate last referred to is demonstrated by the fact that during the course of the operations the number of pounds shipped never fell below 30,000,000 pounds per month and went as high as 65,000,000 pounds per month. National Freight never operated at a profit.

National Freight purchased other freight forwarding companies. The price of one was so high that no independent-minded corporation would have paid it. This was the Judson Freight Forwarding Company. On August 14, 1929 Mr. Edward C. Strohm, president of National Freight, recommended the purchase of the Judson Company for not more than $2,000,000. In May, 1929, Mr. J. F. Deasy, assistant operating vice-president of Pennsylvania, Mr. John B. Large, general traffic manager of Pennsylvania, and Mr. Lee talked with Mr. Strohm in respect to purchasing Judson Company. Mr. Strohm's advice was that the company was not worth more than $1,200,000 and that Judson Company's owners were anxious to sell. Mr. Lee told Judson Company's owners that he was not interested in paying a "price for Judson based largely upon prospects which would primarily benefit the railroads over which the forwarder operated * * *"; that Pennroad's interest in Judson Company was strictly a commercial one. Pennroad's actions belied this assertion, for on August 31, 1929 National Freight's board authorized the purchase of Judson Company for the price of $1,850,000. The transaction was consummated immediately. It should be noted that an audit made as of September 6, 1929 indicated the net worth of the company was about $230,000. It had operated at a loss of $30,466 in 1928 and in the first five months of 1929 showed a profit of only $1700. It was an unsuccessful enterprise.

National Freight incorporated National Carloading Company and transferred its assets to it, receiving National Carloading stock in return. Pennroad's advances seem to have been made to National Freight which in turn advanced funds to National Carloading. National Freight had exhausted quickly the money received from its capital subscription. The question of financing the freight forwarding project became acute. Pennroad's project was encountering competition from the New York Central's freight forwarding subsidiary, the most powerful in the country. It should

be noted that in March, 1930 three independent persons, not directors of Pennsylvania, had been elected to Pennroad's board. These men as well as the other directors of Pennroad became concerned acutely with Pennroad's position in the freight forwarding business. One of the independent directors, Mr. A. H. S. Post, testified that he raised the question as to whether Pennroad should make further advances to National Freight and that General Atterbury replied that that company would be taken over by Pennsylvania as soon as a method could be devised to do so. Advances, however, continued to be made by Pennroad to National Freight for the benefit of National Carloading.

The freight forwarding business, without regard for the corporate entities, was operated substantially as a department of Pennsylvania but National Freight paid sums totalling over $3,000,000 to Pennsylvania for freights and rentals. Messrs. Lee, Ogden and County quickly reached and expressed the conclusion that Pennsylvania owed a moral duty to Pennroad to take over National Freight "in some fashion."

Long before October, 1932, it was obvious that Pennroad's speculation in the business of freight forwarding would have to be liquidated if further disastrous losses were to be avoided. On October 13, 1932 American Contract and Trust Company, a wholly-owned subsidiary of Pennsylvania, made an offer to purchase National Carloading for $100,000 in cash and $400,000 in securities. The plaintiffs contend that this offer was not bona fide and this assertion seems justified by the record. Subsequently an offer was made by the Van Sweringen interests to pay $100,000 in cash and $300,000 in 6% notes. An agreement was proposed whereby Pennroad would sell its interest in National Carloading to Standard Carloading Company, a Van Sweringen company, for the consideration stated.

On February 23, 1933 Pennroad's board approved the proposed sale of National Carloading to Standard Carloading for $100,000 in cash and $300,000 in 6% notes. A firm offer to purchase was made by Standard Carloading Company on March 30, 1933 and was accepted by National Freight on March 31, 1933, but the consideration was $400,000 in 6% notes and no cash. The contract also contained a provision whereby Standard Carloading could liquidate its entire obligation by paying certain amounts in cash. The contract as executed by National Freight with Standard Carloading was ratified by Pennroad's board on April 12, 1933. The reason for the subsequent ratification in view of the prior authorization by Pennroad's board was because of the changes effected in the terms of the contract of sale. The option to pay cash as stipulated was exercised by the Standard Carloading in 1935 when Standard Carloading paid National Freight $381,000.

With the sale of National Carloading to the Van Sweringen interests the opportunity of Pennroad to compel Pennsylvania to take over the freight forwarding project came to an end. Pennroad's sole hope of recoupment lay in a suit against Pennsylvania.

The learned District Judge held that National Freight was an agency or instrumentality of Pennsylvania, employed for the purpose of establishing Pennsylvania in the freight forwarding business in competition with other railroads engaged in the same business.[34] In its findings of fact the Court found also that National Freight was "a new enterprise speculative in character and which subjected Pennroad to the whole risk while Pennsylvania Railroad enjoyed the benefits therefrom."[35] The District Court stated that: "The actions of the directors and managers [of Pennroad], and of the Pennsylvania Railroad in exercising its practical control and domination of them, in the freight enterprise constituted the most flagrant breach of the fiduciary obligation imposed upon them by the circumstances of this case. It is equally clear that the sole beneficiary of the National Freight venture was the Pennsylvania Railroad and that it did profit substantially from freight revenues, rentals and the promotion of its competitive position as long as the freight company was operated. The liability should therefore in good conscience be imposed upon that member of the group who directed or controlled it

---

[34] Designated as "Conclusion of Law" No. 4. See 42 F.Supp. at page 625. The statement in reality is a finding of fact.

[35] Finding of Fact No. 29. See 42 F. Supp. at page 624.

and who profited by the action taken."[36] All of these findings with the exception of that portion of the one last quoted which regards freight revenues and rentals received by Pennsylvania from National Freight Company as profits are supported fully by the record.

The court's judgment requires Pennsylvania to reimburse Pennroad for all damages incurred by it arising out of the National Freight transaction which it determined to be in the amount of $3,852,000. It also requires Pennsylvania to account to Pennroad for all "profits" which Pennsylvania received from Pennroad by way of freight charges and rents. The court found that these "profits" amounted to $3,390,250. These charges, were not profits but under the views expressed hereinafter it is unnecessary to discuss the reasoning or to develop the formula by which the court below arrived at the item of liability last stated.

*Summary of the Transactions Complained of.* I have endeavored to present a fair picture of each of the eight transactions complained of though much detail necessarily has been omitted. All the transactions seem to fall into the same pattern in that the purchase of securities by Pennroad was dictated by considerations of advantage to Pennsylvania rather than by a regard for the benefit and profit of Pennroad and its stockholders. The individual defendants, directors of Pennroad, conducted themselves in Pennroad's affairs as if they were directors of Pennsylvania.[37] The eight transactions complained of constitute nothing more than steps in the execution of a whole and single plan conceived by Pennsylvania to make use of a corporate entity, Pennroad, represented to the security holders of the latter and to the public at large as an independent entity, to protect and enlarge Pennsylvania's railroad empire. Though Pennsylvania's course may be broken down into separate incidents, including the eight transactions complained of, its conduct toward Pennroad was a continuous and uninterrupted execution of a whole and single plan. In determining certain aspects of the legal liability of the defendants we should look to that plan as a whole instead of to the separate incidents complained of, which were in fact but overt acts in a continuous civil conspiracy.

### Law.

#### I. As to the Liability of the Individual Defendants.

Whether the jurisdiction of a federal court of equity is concurrent or exclusive must be determined by federal decisions. Russell v. Todd, 309 U.S. 280, 286, 60 S.Ct. 527, 84 L.Ed. 754; Stratton v. St. Louis S. W. R. Co., 284 U.S. 530, 534, 52 S.Ct. 222, 76 L.Ed. 465; York v. Guaranty Trust Co. of New York, 2 Cir., 143 F.2d 503, 526. A stockholder's derivative suit brought against directors to compel them to respond in damages to their corporation for losses sustained because of their conduct as directors lies in the concurrent equity jurisdiction of the federal courts. This has been the law since the founding of the Republic. See Dodge v. Woolsey, 18 How. 331, 340-347, 15 L.Ed. 401. The suits at bar are based on "concurrent" equity jurisdiction of equity. While causes of action exclusively equitable in their nature might have been asserted against certain individual defendants in the cases at bar in their capacities as voting trustee, the complaints do not specifically allege breaches of trust against the voting trustees as such and relief is not asked against individual defendants as voting trustees. The

[36] See 42 F.Supp. at page 620.

The court stated also, "The defendant Pennsylvania Railroad is * * * chargeable with the whole amount of the capital contributed to the National Freight venture on its behalf and is required to reimburse Pennroad for such sum. Credit, however, shall be given for the net amount received by Pennroad in the final disposition of its holdings in the freight company. The Pennsylvania Railroad is also accountable to Pennroad for any and all net profit it received from the operation of National Freight on its behalf by Pennroad. The breach of fiduciary duty in this transaction is such that the railroad is not entitled to any benefit whatever as against Pennroad and its certificate holders and a full accounting of the more than five million dollars gross income should be rendered so that the net profits may inure to the lawful beneficiaries of the business."

[37] It should be made clear, however, in justice to the individual defendants that no evidence has been offered and no suggestion has been made that they were guilty of any desire to gain financial profits for themselves by their acceptance of Pennsylvania's mandates. Each of them purchased substantial amounts of Pennroad stock and they continued to hold it.

suits therefore are not based on the exclusive jurisdiction of equity.

In Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477, it was held that in diversity of citizenship cases a federal court must follow the rule of conflicts of the State in which it sits. The conflict-of-laws rule of Pennsylvania is that the liability of directors of a foreign corporation, resident in Pennsylvania, is governed by the law of the state of the incorporation of the company. See Cochran v. Shetler,[38] 286 Pa. 226, 133 A. 232.

The majority seem to take the position that the acts complained of, if they form the basis for any liability, were torts committed in Pennsylvania and, therefore, that the law of Pennsylvania must be applied in the forum of the District Court of the United States for the Eastern District of Pennsylvania; that the law of the State of Pennroad's incorporation, the law of Delaware, must be disregarded. Difficulties arise in the application of such a principle. If the individual purchases of stock complained of be treated as the bases of the torts, an examination of the record will disclose that these transactions took place at widely separated places. As examples it will be seen that the purchase of the securities of DTI was consummated in Michigan; that the offer to purchase the stock of PWV was made in New York City and was accepted by divers persons in several states, the purchases being made apparently in various jurisdictions; that the various individual transactions comprising the freight forwarding project took place in widely separated localities, occurring variously in Pennsylvania, in Ohio and in New York; that the voting trust was set up under the law of Delaware and that the acts leading to the incorporation of Pennroad took place there. If the trans-

actions complained of be treated as steps in executing a whole and single plan entered into by Pennsylvania, with the cooperation of the individual defendants, to employ Pennroad's funds for the vicarious enjoyment of Pennsylvania without regard for the benefit of Pennroad and its stockholders (which I think is the correct view) the record will support the position that that plan was entered into in Pennsylvania. But the majority do not take such a view, seemingly adhering to the position that the individual transactions constituted separate torts, if they were torts. The greater difficulty with the majority view lies, I think, in the fact that, absent the employment of the Delaware law as a measuring rod, the determination of the liability of the individual defendants must be adjudicated in a kind of legal vacuum for unless the law of Delaware be used there are no criteria by which the duties and liabilities of the directors of a Delaware corporation to their company can be determined. The conflict-of-laws rule of Pennsylvania does not require the result effected by the majority. A Pennsylvania forum would look to the law of Delaware as governing the liability of the individual defendants, former directors and officers of Pennroad.

There is no decision of the Delaware courts based on circumstances identical with those of the cases at bar but there are rulings of the Delaware courts which indicate the law which should be applied in the instant cases. Ordinarily a presumption exists that the action taken by directors of a corporation are in the best interests of the corporation. Mercantile Trading Company v. Rosenbaum Grain Corporation, 17 Del.Ch. 325, 154 A. 457. That presumption, if it existed under the circumstances at bar has been obliterated by the evidence. Directors are fiduciaries who must be faithful to their trust and

---

[38] In the Cochran case, the receiver of a Delaware corporation sought to recover from its directors dividends alleged to have been paid illegally. In Wettengel v. Robinson, 288 Pa. 362, 370, 371, 136 A. 673, 675, the Supreme Court of Pennsylvania looked to the statute of West Virginia and to a decision of the Supreme Court of West Virginia, Lynchburg Colliery Co. v. Gauley, etc., Ry. Co., 92 W.Va. 144, 114 S.E. 462, in order to determine the status and powers of a corporation and its directors after the surrender of the corporate charter. The decision of the Supreme Court of Pennsylvania in Converse v. Paret, 228

Pa. 156, 77 A. 429, 30 L.R.A.,N.S., 1092, offers further evidence by analogy that the courts of Pennsylvania will employ the law of the state of incorporation of a foreign corporation in order to determine the liability of a shareholder of such a corporation. It must be concluded that the Pennsylvania rule as to the measure of liability of directors of a foreign corporation is no different in this respect from that of most of the States. See Restatement, Conflict of Laws, Sections 187, 189, 191, and the Pennsylvania Annotations thereto, Beale, The Conflict of Laws, Section 185.2.

exercise honest business judgment. Equity will intervene to compel just dealing with a corporation when its directors have interests adverse to those of their corporation or when they act with reckless indifference to the rights of the corporation or of its stockholders. Karasik v. Pacific Eastern Corp., 21 Del.Ch. 81, 180 A. 604. In Martin v. D. B. Martin Co., 10 Del.Ch. 211, 215, 88 A. 612, 614, 102 A. 373, the Chancellor of Delaware, quoting Morawetz on Private Corporations, Section 529-530, held that persons who are directors and agents in each of two corporations cannot represent both in a transaction in which the interests of the two are opposed. In Keenan v. Eshleman, 23 Del.Ch. 234, 2 A. 2d 904, 908, 120 A.L.R. 227, Chief Justice Layton stated: "The appellants were in absolute control of both corporations. As directors, they were trustees for the stockholders, and the utmost good faith and fair dealing was expected of them, especially where their individual interests were concerned. * * * In the second place, dealing * * * with another corporation of which they were the sole directors and officers, they assumed the burden of showing the entire fairness of the transaction."[39]

The decision of the Supreme Court of Delaware in Guth v. Loft, Inc., 23 Del.Ch. 255, 270, 5 A.2d 503, 510, is indicative of the principles of law which must be applied in the instant cases. In the cited case Chief Justice Layton stated: "Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relation to the corporation and its stockholders. A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director,

peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest. The occasions for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule can be formulated. The standard of loyalty is measured by no fixed scale." In the recent case of Bovay v. H. M. Byllesby & Co., Del.Ch. 38 A.2d 808, 813, the Supreme Court of Delaware reiterated and re-emphasized this doctrine.

If the words "self-interest" be eliminated from the quotation contained in the previous paragraph and a phrase such as the "interest of another corporation" or the "interest of Pennsylvania" be substituted, the Supreme Court of Delaware would have stated the precise principle of law applicable in the cases at bar.[40]

The District Court found that Pennroad was subject to the control of Pennsylvania and that the eight transactions complained of were induced or made " * * * in furtherance of the plans or under the domination of Pennsylvania * * *"; that this control and domination was effected by means of the voting trust through which Pennsylvania's own directors were elected directors of Pennroad; that "Pennroad did not act as an independent company serving its own purposes primarily but * * * in the interest of and for the purpose of benefiting Pennsylvania Railroad by the accomplishment of its plans and purposes."[41] These findings are sup-

---

[39] The Chief Justice cited Geddes v. Anaconda Copper Min. Co., 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425.

[40] Chancellor Wolcott in Bodell v. General Gas & Electric Corp., 15 Del.Ch. 119, 131, 132, 132 A. 442, 447, stated that "Trustees [directors] owe not alone the duty to refrain from profiting themselves at the expense of their beneficiaries. They owe the duty of saving their beneficiaries from loss", citing Cahall v. Burbage, 14 Del.Ch. 55, 121 A. 646, and Allied Chemical & Dye Corp. v. Steel & Tube Co., 14

Del.Ch. 1, 120 A. 486; and Id., 14 Del.Ch. 117, 122 A. 142.

[41] See findings Nos. 1 to 35, inclusive, in the opinion at 42 F.Supp. at pages 621–625. The quotations are from findings Nos. 33 and 22. It should be noted also that in his second conclusion of law, 42 F. Supp. at page 625, the trial judge stated: "The actions of said defendants in inducing and directing Pennroad purchases and investments in the interests of and for the benefit of Pennsylvania Railroad constituted a breach of their fiduciary duties for which they are accountable."

ported by an abundance of evidence. In addition the District Judge pronounced the following conclusion of law: "The actions of said defendants in inducing and directing Pennroad purchases and investments in the interests of and for the benefit of Pennsylvania Railroad constituted a breach of their fiduciary duties for which they are accountable."[42]

The District Court correctly applied the law. Peremptorily and inexorably under the law of Delaware the most scrupulous observance of duty was required of the individual defendants, not only affirmatively to protect the interests of Pennroad, but also to refrain from doing anything that would work injury to the corporation or to its profit or advantage.[43] The individual defendants therefore, with the exception of Mr. Wayne,[44] must be held liable jointly and severally for the damages which Pennroad sustained. Mr. Wayne should be held liable with the other individual defendants for the damages sustained by Pennroad in the freight forwarding transactions.

## II. As to Pennsylvania's Liability.

The causes of action asserted against Pennsylvania lie also within the concurrent equity jurisdiction. Pennsylvania exercised dominion and control over Pennroad by naming the voting trustees[45] who elected Pennroad's directors. These, in the graphic language of Mr. County, were "our own people." Pennsylvania was in fact the manager of Pennroad and substituted its judgment for that of Pennroad's directors. I conclude therefore that Pennsylvania had a status analogous to that ordinarily possessed by directors of a corporation in relation to their corporation. For the reasons stated under the preceding heading of this opinion I conclude that a Pennslyvania forum would apply the law of Delaware to measure and determine the liability of Pennsylvania for its management of Pennroad. I conclude, therefore, that a district court of the United States sitting in Pennsylvania must apply the law of Delaware in order to define Pennsylvania's liability under the circumstances presented by the instant cases.

The nature of that law is demonstrated by the decision of the Supreme Court of Delaware in Bovay v. H. M. Byllesby & Co., supra. Bovay's bill alleged that the defendants, two corporations, dominating the directors of a third corporation, had converted its assets. The bill sought to compel the defendants to account for and to refund the value of the property converted. The Supreme Court of Delaware stated, 38 A.2d at page 813: "The defendants, or Byllesby & Co., at least, were in complete control of the bankrupt. As regards corporate action, Byllesby & Co. was the bridge company. What it proposed as the bridge company, it accepted as Byllesby & Co." Though the suit in the cited case was brought by trustees in bankruptcy, the case, as already indicated, was within the concurrent equity jurisdiction. The Supreme Court considered the defendant corporations to be in a strict fiduciary relationship to the bridge company and made plain that if the allegations of the bill were sustained by proof, the defendants would be held to a strict accounting. The circumstances of the cited case are close to those of the cases at bar. See also Eshleman v. Keenan, 21 Del.Ch. 116, 181 A. 655; Id., 21 Del.Ch. 259, 187 A. 25, affirmed 23 Del.Ch. 234, 2 A.2d 904, 120 A.L.R. 227. It follows that Pennsylvania also must be held liable for the damages suffered by Pennroad.

## III. Measure of Damages.

What are the stockholders represented by the plaintiffs entitled to recover from the individual defendants and from Pennsylvania for Pennroad? At this point there seems to occur the immemorial division between substantive and remedial rights in

[42] Conclusion of law No. 2, 42 F.Supp. at page 625. Contrast the stronger language used by the court in characterizing the freight forwarding transactions.

[43] It should be observed that under the law of Delaware the principle is well established that where transactions are consummated on behalf of the corporation by directors who possess interests adverse to those of the corporation, the transactions may be set aside because of the dual relationship without regard to the fairness of the transactions or the good faith of the directors. See Lofland v. Cahall, 13 Del. Ch. 384, 118 A. 1; Cahall v. Burbage, 14 Del.Ch. 55, 121 A. 646; Allied Chemical & Dye Corporation v. Steel & Tube Co. of America, 14 Del.Ch. 1, 120 A. 486; and Bodell v. General Gas & Electric Corp., 15 Del.Ch. 119, 132 A. 442.

[44] See note 7 supra.

[45] The voting trust was set up under Section 18 of the Delaware Corporation Law as amended by the Act of March 22, 1929, 36 Delaware Laws, Chapter 135.

federal courts of equity. Assuming, as I have and must, that the decision of the Supreme Court in Ruhlin v. New York Life Ins. Co.,[46] 304 U.S. 202, 58 S.Ct. 860, 82 L.Ed. 1290, extends the doctrine of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, to actions in equity in the federal courts and that therefore the Supreme Court has wiped out substantive rights theretofore granted under the "general" federal equity law, there remain the equitable remedies to be applied in the federal courts.[47] See the decision of this court in Black & Yates v. Mahogany Ass'n, 129 F.2d 227, 233. The measure of damages grows out of the application of a remedial right. What the measure of damages is in suits such as those at bar is manifested by such decisions as Hodgman v. Atlantic Refining Co., D.C., 300 F. 590, 600, reversed on other grounds 3 Cir., 13 F.2d 781, and Brinckerhoff v. Roosevelt, C.C., 131 F. 955, affirmed 2 Cir., 143 F. 478. The application of the proper measure of damages in the suits at bar would require full restitution to Pennroad for the losses incurred by it by reason of the acts complained of.[48]

The defendants contend that no matter in what securities Pennroad had invested, losses in all probability would have been incurred because of the depression. The District Court recognized this theory in arriving at a measure of damages. This was error. The authorities indicate that when the breach of trust has been intentional the court will treat this as a pertinent factor. The defendants acted with the conscious intention of benefiting Pennsylvania and with a conscious lack of regard for the interests of Pennroad.[49] Under the circumstances it seems appropriate to turn to the law of trusts for analogy. Scott on Trusts, Section 205.1, states: "It is no defense to the trustee that if he had purchased proper trust investments there probably would have been a loss equally great because of general economic conditions and the general fall in values. In such a case the loss results from the breach of trust, although it is possible that a similar loss would have occurred even if there had been no breach of trust." See also Perry on Trusts, 6th Edition, Vol. 2, Section 847, p. 1386. In my opinion the defense asserted by the defendants in this connection is without merit.

As part of the measure of restitution must the defendants pay interest on the sums found to be due from them? In my

---

[46] In the Ruhlin case the sole question before the Supreme Court was the effect of the incontestability clause of a life insurance policy, but that it was the intention of the Supreme Court to extend the doctrine of the Tompkins case to the adjudication of substantive rights in federal courts of equity may not be doubted. The Supreme Court suggested a comparison of Mason v. United States, 260 U.S. 545, 557, 558, 43 S.Ct. 200, 67 L.Ed. 396.

[47] This question is discussed at greater length under heading IV of this opinion.

[48] If on the other hand the rule of law is applied that the measure of damages is an inseparable part of the substantive law which creates the right to damages, the same result would be reached. As is stated in Beale, The Conflict of Laws, Section 412.1, "The law that creates the right creates also the measure of the right.", quoting Mr. Justice Pitney in Chesapeake & Ohio R. Co. v. Kelly, 241 U.S. 485, 491, 36 S.Ct. 630, 632, 60 L.Ed. 1117, L. R.A.1917F, 367, that " * * * the question of the proper measure of damages is inseparably connected with the right of action * * * ", and citing Sedgwick, Damages (9th Ed.) Section 1373, and Royal M. S. P. Co. v. Companhia De Navegaco, D. C., 31 F.2d 757. Since the courts of Pennsylvania would look to the law of Delaware under the instant circumstances as the law which measures the liability of the defendants, it would look also to that law to determine the measure of the right. Klaxon Co. v. Stentor Electric Mfg. Co., supra, does not require a different result. The law of Delaware clearly requires the defendants to restore Pennroad to the position it would have occupied had it not been for the wrongful acts complained of. See Lofland v. Cahall, 13 Del.Ch. 384, 118 A. 1, and Guth v. Loft, Inc., supra. There is no question but that the law of Pennsylvania is to the same effect.

[49] I am not unmindful of the statements made by the District Court (many of them quoted in the majority opinion of this court) which attempt to absolve the individual directors of Pennroad from any conscious breach of fiduciary duty while finding Pennsylvania guilty of such breaches. An inconsistency is apparent since Pennsylvania, a corporation, could and did act in Pennroad's affairs only through the medium of the individual defendants, voting trustees and directors. The District Court so found. If the specific findings of fact made by the court below (see note 57 infra) are examined, it will be apparent that the court below found that the individual defendants knew what they were doing and why they were doing it.

opinion, in the cases at bar, this question is not governed by the decision in Klaxon Co. v. Stentor Electric Mfg. Co., supra. In the cited case the right to add interest to the amount of the sums to be recovered was held to be an item of damages to be granted or withheld in diversity cases as required by the law of the State in which the district court was held, but the action was one at law and not in equity. The division heretofore referred to between substantive and remedial rights in federal courts of equity must be deemed to be applicable in the cases at bar. Interest at the rate of 6% per annum therefore should be added as damages upon the sums found to be due from the defendants to Pennroad.[50] See Hodgman v. Atlantic Refining Co. and Brinckerhoff v. Roosevelt, supra.

IV. Statutes of Limitations and Laches.

Application of Russell v. Todd.

The majority rely on Russell v. Todd, 309 U.S. 280, 60 S.Ct. 527, 84 L.Ed. 754,

in support of the proposition that statutes of limitations of Pennsylvania bar recovery in the instant cases. The statute which is said to bar Pennsylvania's liability is the Act of March 27, 1713, 12 P.S. § 31. It is set out in haec verba in note 6 of the majority opinion and need not be described further at this point of this opinion. The statute which the majority and the District Court hold to be a bar to recovery against the individual defendants is the Act of March 28, 1867, 12 P.S.Pa. § 41. It provides in pertinent part that " * * * no suit, at law or in equity, shall be brought or maintained against any * * * director in any corporation * * * to charge him * * * with any neglect of duty as such * * * director, except within six years after * * * the commission of such act of negligence * * *."

Todd's suit was based on the exclusive equitable jurisdiction but Mr. Justice Stone made use of language [51] which the majority of this court conclude is apposite to the cases at bar. I think that the majority in

[50] If the right to interest be governed by the law of the forum as an incidental right within the purview of Klaxon Co. v. Stentor Electric Mfg. Co., supra, (which I think is not the case) the result would be substantially the same. The law of Pennsylvania would govern. Under the Pennsylvania law in tort cases interest is not allowed but compensation, the equivalent of interest, is allowed as an element in the assessment of the amount of damages suffered by the plaintiff See United States v. Bethlehem Steel Corporation, 23 F.Supp. 676, 681, affirmed, though on somewhat different grounds as to the point cited, by this court, 113 F.2d 301, 308, and by the Supreme Court, 315 U.S. 289, 62 S. Ct. 581, 86 L.Ed. 855. See also Fidelity-Philadelphia Trust Company v. Simpson, 293 Pa. 577, 143 A. 202. The decision of the Superior Court of Pennsylvania in McDermott v. McDermott, 130 Pa.Super. 127, 130, 196 A. 889, 890, is helpful. In that case Judge Parker stated, "An examination of the cases dealing with the charge and allowance of interest will disclose many difficulties, but the decided trend of courts of law and courts of equity has been 'to break away from hard and fast rules and charge and allow interest in accordance with principles of equity, in order to accomplish justice in each particular case.' John Agnew Co. v. Board of Education, 83 N.J.Eq. 49, 89 A. 1046, 1054. Unless a case be found, which is a conclusive precedent, the safest and at the same time the fairest way for a court is to decide questions pertaining to interest according to a

plain and simple consideration of justice and fair dealing. We have been referred to no precedent that is controlling." If the law of Pennsylvania is applicable some sum should be allowed as the equivalent of interest as an element in the assessment of the damages suffered by Pennroad's stockholders. Since Pennroad was an investment company, the damages, the equivalent of interest, at the rate of 6% per annum might be appropriate.

[51] The language referred to, 309 U.S. at pages 288, 289, 60 S.Ct. at page 531, 84 L.Ed. 754, is as follows:

"In federal courts of equity the doctrine of laches was early supplemented by the rule that when the question is of lapse of time barring relief in equity, such courts, even though not regarding themselves as bound by state statutes of limitations, will nevertheless, when consonant with equitable principles, adopt and apply as their own, the local statute of limitations applicable to the equitable causes of action in the judicial district in which the case is heard. * * *

"Even though there is no state statute applicable to similar equitable demands, when the jurisdiction of the federal court is concurrent with that at law, or the suit is brought in aid of a legal right, equity will withhold its remedy if the legal right is barred by the local statute of limitations. It thus stays its hand in aid of a legal right which, under the Rules of Decision Act, would be unenforcible in the federal courts of law as well as in the state courts. * * * "

so concluding overlook two very pertinent portions of the Todd opinion. In the first paragraph quoted in note 51 supra, Mr. Justice Stone states that federal courts ordinarily will adopt state statutes of limitations when exercising the concurrent equity jurisdiction but points out that they will do so "when consonant with equitable principles." Second, in note 1 [52] to Mr. Justice Stone's opinion, emphasis is laid on the fact that federal courts of equity have not bound themselves to apply local statutes of limitations when those statutes conflict with equitable principles and cites (I think with approval) such cases as Kirby v. Lake Shore & Michigan Southern R. Co., 120 U.S. 130, 7 S.Ct. 430, 434, 30 L.Ed. 569.

In the Kirby case a suit had been brought in the Circuit Court for the Southern District of New York to set aside a settlement of accounts. The action was based on the concurrent equity jurisdiction. The defendant pleaded a statute of limitations of New York. The Supreme Court stated: " * * * it is clear that the statute of New York upon the subject of limitation does not affect the power and duty of the court below—following the settled rules of equity—to adjudge that time did not run in favor of defendants, charged with actual concealed fraud, until after such fraud was, or should with due diligence have been, discovered. Upon any other theory the equity jurisdiction of the courts of the United States could not be exercised according to rules and principles applicable alike in every state. It is undoubtedly true, as announced in adjudged cases, that courts of equity feel themselves bound, in cases of concurrent jurisdiction, by the statutes of limitation that govern courts of law in similar circumstances, and that sometimes they act upon the analogy of the like limitation at law. But these general rules must be taken subject to the qualification that the equity jurisdiction of the courts of the United States cannot be impaired by the laws of the respective states in which they sit." Mr. Justice Harlan cited such authorities as Robinson v. Campbell, 3 Wheat. 212, 4 L.Ed. 372, and Boyle v. Zacharie, 6 Pet. 648, 658, 8 L.Ed. 532.

I conclude that it was not the intention of the Supreme Court in the Todd case to overrule the Kirby case and similar decisions and to merge the historic distinctions between "remedial rights" in equity and the substantive law. Such a step, to my mind at least, would have been the subject of a direct and unequivocal pronouncement by the Supreme Court. It seems to me that Mr. Justice Stone in the Todd case indicated that the remedial rights of a federal court of equity were to be preserved, not destroyed. The Court of Appeals for the Second Circuit in its recent decision in York v. Guaranty Trust Co. of New York, 143 F.2d 503, 521-526, 531, reached a conclusion similar to that here expressed.[53], [54] See also the decision of

---

[52] The note states in part, 309 U.S. at pages 288, 289, 60 S.Ct. at page 532, 84 L.Ed. 754, "Federal courts of equity have not considered themselves obligated to apply local statutes of limitations when they conflict with equitable principles, as where they apply, irrespective of the plaintiff's ignorance of his rights because of the fraud or inequitable conduct of the defendant", citing, inter alia, Kirby v. Lake Shore & Michigan Southern R. Co., 120 U.S. 130, 7 S.Ct. 430, 30 L.Ed. 569.

[53] In York v. Guaranty Trust Co. of New York, Judge Learned Hand concurred in Judge Frank's opinion. Judge Augustus Hand dissented but stated, "Since the rule announced in Erie R. Co. v. Tompkins * * * and Ruhlin v. New York Life Insurance Co. * * * became law, I think the situation is most rare when we should disregard the local statute of limitations because the proceeding is equitable. This seems implicit in the decision in Russell v. Todd * * * and while, because of the footnote [1] [in Mr. Justice Stone's opinion] * * * it seems probable that equitable claims may be asserted in extreme situations even if the local statute of limitations has expired, I cannot believe that the present is such an occasion. Any fault here lay in the omission of the trustee to warn the plaintiff of the loss she would incur if she failed to accept the debtor's offer. That I regard as at most an act of negligence which was something far different from a deliberate concealment * * *." It will be observed that the learned dissenting Judge was of the opinion that the statute of limitations of the State would not be applied by a federal court of equity "in extreme situations."

[54] Certiorari was granted by the Supreme Court Oct. 9, 1944, 65 S.Ct. 60, in the York case limited to the first question presented by the petition. That question is as follows: "In an equity case in a Federal court based on diversity of citizenship, is the court bound by the State statute of limitations held to govern like cases by the State courts?"

the Circuit Court of Appeals for the Fourth Circuit in Committee for Holders, etc., v. Kent, 143 F.2d 684, 687.

It may be argued that the Pennsylvania 1867 Act by its terms applies specifically to actions "in equity" against directors and that for this reason, if for no other, it must be applied for the benefit of the individual defendants in the cases at bar. I can find no case in point in respect to the concurrent equity jurisdiction. Such statutes have not been applied in the past to causes lying within the exclusive equity jurisdiction. See Alsop v. Riker, 155 U.S. 448, 15 S.Ct. 162, 39 L.Ed. 218, and Patterson v. Hewitt, 195 U.S. 309, 318, 25 S. Ct. 35, 49 L.Ed. 214, cited in note 1 of Mr. Justice Stone's opinion in the Todd case, and note 47 to Judge Frank's opinion in the York case, 143 F.2d at page 526. It should be pointed out, however, that in the final paragraph of the Todd opinion the way is perhaps left open for a revision of the law in this respect. But I can perceive no ground on reason or authority why a federal court should apply a state statute of limitations, even one dealing specifically with suits in equity, to a suit within the concurrent equity jurisdiction when it would not be consonant with equitable principles to do so. I conclude, therefore, that if the application of the statutes of limitations of Pennsylvania, including the Act of 1867, would conflict with the equitable principles which historically have governed federal courts in giving effect to remedial rights, those statutes may not be applied in the cases at bar.[55]

In my opinion the circumstances disclosed by the evidence in the instant cases are such as to make the application of the Pennsylvania statutes of limitations inconsonant with equitable principles. The transactions complained of continued over a period of years and possessed an enormously intricate factual background. They appear to me, for the reasons stated hereinbefore, to have been separate complex incidents in what was in fact a single premeditated plan whereby Pennsylvania was to obtain a vicarious enjoyment of Pennroad's resources without regard to Pennroad's benefit or damage. There was no disclosure of the fundamental fact, upon which the whole plan turned, that the voting trustees were to be "our own people" in the sense that Mr. County used that phrase and that the board of directors voted into office by those voting trustees would possess a primary loyalty to Pennsylvania and be subject to Pennsylvania's dominion and control to the deriment of Pennroad.[56] This was the fundamental vice of Pennsylvania's plan, the vice that in large measure caused Pennroad's losses. Insofar as is here pertinent to the transactions complained of, the plan for the domination of Pennroad began prior to the incorporation of Pennroad, continued with the designation of the voting trustees and the election of Pennroad's directors, was carried on by the eight transactions complained of, and reached what was probably its richest fruition for Pennsylvania in the National Freight transactions. The average layman scarcely could comprehend what took place without technical explanations difficult to make and more difficult to understand. Moreover, in addition to the concealment of the great and fundamental fact heretofore referred to, there was active concealment of lesser pertinent facts by Pennsylvania with the cooperation of the individual defendants as directors, as the findings made by the District Court in its opinion and set out below demonstrate.[57] The attitude of Pennsylvania, which was in fact the attitude of Penn-

[55] The majority opinion in the cases at bar in effect overrules the decision of this court in Black & Yates v. Mahogany Ass'n, supra, 129 F.2d at page 233, where it was stated, "The rule of Erie R. Co. v. Tompkins being determinative of substantive rights, there is still preserved to the federal courts a uniform basis for granting equitable remedies in cases in which substantive rights have arisen under state law."

[56] In this connection see the 25th finding of fact made by the District Judge, as follows: "The original directors of Pennroad who were also directors of Pennsylvania Railroad participated in and were the active agents of Pennsylvania Railroad in formulating and executing the said plan." 42 F.Supp. at page 624. This finding has full support in the evidence.

[57] See 42 F.Supp. at pages 612, 613 and in particular the following findings as to facts embodied in the court's opinion.

"As a matter of fact it seems that the only information available to certificate holders was that given in the annual statements, from news reports and investment manuals and possibly from reports of public investigations. The statements, news items and manuals did not

road's directors, is exemplified by plaintiffs' exhibit No. 609, "Note in Connection with Annual Meeting." This document is too long for reproduction in this opinion, but it indicates a state of mind in which the candor required of fiduciaries dealing with cestuis is quite lacking.[58] As is pointed out in the findings of fact quoted in note 57 supra, the statements given to the security holders of Pennroad omitted important details "as to the motives, the bene-

fits and risks involved" in the transactions complained of. Certainly the suits at bar are within the ruling of the Kirby case. There was concealment of pertinent facts and a federal court of equity should not apply a statute of limitations.

The plaintiffs in the suits at bar were not aware of the circumstances surrounding the transactions complained of until publicity had been given to them by the investigation conducted by the Wheeler

---

make available information as to the prior negotiations and interests of Pennsylvania Railroad, the motives which prompted the formation and management of Pennroad, nor the known hazards and risks which it undertook for the benefit of the Pennsylvania Railroad."

"It was obviously the intention of the railroad, to keep as secret as possible the details regarding Pennsylvania Railroad's interests and connections with Pennroad investments and the fact that Pennroad was an agency or instrumentality through which it sought to bring other railroad properties and business into its sphere."

"The disclosures made by Pennroad indicated that the stock purchases were investments in transportation companies from which Pennsylvania Railroad might also be expected to benefit, but the important details as to the motives, the benefits and the risks involved in those investments were not made public."

"The attitude of the corporation was most clearly indicated by President Lee who declared, 'We have followed the policy so far of not ourselves making any public statements with regard to our ownerships of securities nor of any details connected therewith,' and by Mr. County who said, 'Let somebody else do the figuring.'"

"And it is doubtful whether such details would have been furnished in view of the policy of the company as expressed, and certainly it could not be expected that evidence would have been made available for the purpose of starting this or a similar action. The secrets of Pennroad until the congressional investigation were as inviolate as the secrets of the Tomb of King Tut."

58 It should also be borne in mind that it is extremely doubtful if under the law of Delaware the plaintiff could have obtained inspection of their corporation. It was found by the District Court in its finding No. 9, 42 F.Supp. at page 622, "The charter and by-laws of [Pennroad] provide that no stockholder shall have

any right to inspect any account, book or document except as conferred by the laws of Delaware or unless authorized to do so by the resolution of the board or of the stockholders, and that the corporation shall not be required to make public in any manner to its stockholders or otherwise any statement concerning its assets, liabilities or earnings unless so authorized." The court also found, finding No. 10, Id., that "The purpose of the provisions in the charter limiting the rights of the stockholders was to give the directors of Pennroad control of the corporation at all times and without an interference of persons investing in its stock." Without embarking upon an extended dissertation as to the application of the eighth paragraph of Section 5 of the General Corporation Law and State ex rel. Cochran v. Penn-Beaver Oil Co., 4 W.W.Harr., Del., 81, 143 A. 257, mandamus will issue on the petition of a stockholder to compel the inspection of corporate records where the stockholder shows a clear right on his part to the inspection. See Swift v. State ex rel. Richardson, 7 Houst., Del., 338, 6 A. 856, 32 A. 143, 40 Am.St.Rep. 127. But the legal owners of the stock of Pennroad were the voting trustees and mandamus is held by the courts of Delaware to be "purely a legal remedy * * *." See Schenck v. Salt Dome Oil Corporation, Del.Ch., 34 A.2d 249, 252. I am of the opinion that under the law of Delaware the holders of voting trust certificates could not have compelled their corporation to grant to them an inspection of the books, records, documents and files of Pennroad. This view is fortified by the provisions of the charter heretofore referred to. The Court of Chancery of Delaware will not grant discovery except in aid of a pending suit.

I think it is just to state that the entire set-up was designed, not only to put and keep control of Pennroad in Pennsylvania, but also to prevent the voting-trust certificate holders from obtaining information concerning their corporation.

Committee.[59] It is clear that they have not been guilty of laches.[60]

### Application of Bovay v. H. M. Byllesby & Co.

The question as to whether any statute of limitations (in contradistinction to laches) should be applied in the cases at bar as "consonant with equitable principles" may not be disposed of without consideration of certain aspects of the decision in the Bovay case. In its decision the Supreme Court of Delaware enlarged the nature of the fiduciary relationship existing between the managers of a Delaware corporation and its stockholders. The change effected was one of substantive law, and was reflected in the nature of remedial rights which the court felt should be afforded to the plaintiffs. Specifically the court refused to apply the State statute of limitations [61] ordinarily applicable to suits brought within the concurrent equity jurisdiction of the Delaware Court of Chancery.[62]

Chief Justice Layton stated, 38 A.2d at pages 820, 821:

"Sound public policy requires the acts of corporate officers and directors in dealing with the corporation to be viewed with a reasonable strictness. Where suit is brought in equity to compel them to account for loss or damage resulting to the corporation *through passive neglect of duty, without more,* the argument that they ought not to be deprived of the benefit of the statute of limitations is not without weight; but where they are required *to answer for wrongful acts of commission* by which they have enriched themselves to the injury of the corporation, a court of conscience will not regard such acts as mere torts, but as serious breaches of trust, and will point the moral and make clear the principle that corporate officers and directors, while not in strictness trustees, will, in such case, *be treated as though they were in fact trustees of an express and subsisting trust, and without the protection of the statute of limitations,* especially where insolvency of the corporation is the result of their wrongdoing.

"It follows that the bare plea of the statute of limitations without more, was wholly insufficient in law as a defense to the charges of the complaint." [63]

Bovay and his co-plaintiff were trustees in bankruptcy for the Vicksburg Bridge Company. The Supreme Court pointed out that the bridge company had been rendered insolvent by the acts of the defendants and was "civilly dead," its property being ripe for administration in equity as a trust fund for the benefit of creditors, and the legality of the acts of the defendants would be decided by different principles than those theretofore applicable. Chief Justice Layton enlarged the substantive rights of stockholders of Delaware corporations in the paragraphs quoted above. This enlargement was not dependent on insolvency as will be pointed out hereinafter.

Pennroad never reached insolvency but by the end of 1940, it had lost nearly $100,-000,000, approximately two-thirds of its capital. By the end of 1931, after engaging in business for less than three years, Pennroad's assets had been reduced by

---

[59] See the Wheeler Report, Report No. 1182, 76th Congress, 3rd Sess. It was ordered printed on February 6, 1940. The Splawn and Pecora Investigations of 1931 and 1932 had disclosed many of the pertinent facts but, as the District Court has pointed out, there is no evidence that the plaintiffs received information from these reports from which they could have prepared their cases.

[60] The defendants contend the plaintiffs have been guilty of laches, among other reasons, because of the deaths of a large number of the individual defendants. The learned District Judge answered this contention adequately. I shall not repeat that answer here. See 42 F.Supp. at page 613. General Atterbury has died since the opinion was written.

[61] Section 5129, Delaware Revised Code, 1935, provides: "No action of trespass, no action of replevin, no action of detinue, no action of debt not found upon a record or specialty, no action of account, no action of assumpsit, and no action upon the case shall be brought after the expiration of three years from the accruing of the cause of such action; * * * * ."

[62] If Bovay's suit had been brought in the Superior Court of Delaware for New Castle County to recover a money judgment, it would have been designated as an "action on the case" and the three year period of limitations would have been applied. See Rice v. Pennypacker, 5 Houst., Del., 279, 353, 354, and Dodd v. Wilson, 4 Del.Ch. 399, 407, 408.

[63] Emphasis supplied throughout in this quotation.

about $50,000,000. Pennsylvania's management closely paralleled the management which Byllesby Company was alleged to have given to Vicksburg Bridge Company. The directors of Pennroad had cooperated in Pennsylvania's management though not for their personal profit. The facts of the Bovay case, insolvency aside, as has been stated, are strikingly similar to those of the cases at bar. While the assets of the Vicksburg Bridge Company, in the immemorial language of equity, were a "trust fund" subject to administration for the benefit of creditors, that fund was not before the Delaware Court of Chancery but in the bankruptcy court. It should be borne in mind that from the earliest days of the Delaware corporation law, the assets of Delaware corporations have been treated as trust funds to be administered by the directors for the benefit of the stockholders.

In view of the foregoing I conclude that the Supreme Court of Delaware by the very plain language of Chief Justice Layton in the Bovay opinion intended to serve notice on the world that the managers of a Delaware corporation would be held to the strict obligations of trustees of an express and subsisting trust. The decision in the Bovay case does not turn on the insolvency of the bridge company though that was an issue which the court considered. The language of the paragraphs quoted shows that insolvency of the corporation is not a prerequisite for the application of the rule. The Bovay decision is a declaration by the Supreme Court of Delaware that where disaster has overtaken a Delaware corporation through "wrongful acts of commission" on the part of corporate managers (as disaster overtook Pennroad in the case at bar) and not through their mere passive neglect of duty the substantive rights of the stockholders will be enlarged to the equivalent of those of cestuis under an express trust and statute of limitations of Delaware, ordinarily applicable to causes within the concurrent equity jurisdiction, will not bar an action against the corporate managers.

It follows that the plaintiffs came into the District Court for the Eastern District of Pennsylvania with the standing and rights of cestuis que trustent under an express and subsisting trust and the defendants were subject to the obligations, duties and liabilities of trustees of such a trust. State statutes of limitations, even those specifically designed to be applied to actions based on express trusts, have not heretofore been applied by the federal courts to exclusive equity actions. The Pennsylvania Act of 1867, therefore, should not be applied in the instant cases. Obviously the Pennsylvania Act of 1713 can have no application since it applies only to actions based on legal rights and the Supreme Court of Delaware gives to the plaintiffs the status of cestuis under an express trust. But whether or not the Bovay decision worked a change in the substantive rights of stockholders of Delaware corporations giving them the status just described (as I am convinced it did), it would be inconsonant with equitable principles to apply the 1713 statute in view of the position afforded the stockholders of Pennroad by the decision of the Supreme Court of Delaware.

### The Majority Opinion Erroneously Applies the Pennsylvania Statutes.

Assuming that I am in error in respect to the principles of law heretofore expressed under this heading, I think it is clear that the majority erroneously apply the statutes of limitations of Pennsylvania. To recapitulate: The majority eliminate the liability of the individual defendants, directors of Pennroad (as did the District Court) by the application of the Act of 1867, and the liability of Pennsylvania by the Act of 1713. Both statutes provide a six year period of limitations.

Dealing with the 1867 statute first, I agree with the majority that the courts of Pennsylvania have construed the phrase "any neglect of duty as * * * director" so broadly as to include even wilful malfeasance in office by a director for his own pecuniary profit. I agree also that, absent any concealment or fraud, that the bar of both statutes is in effect six years after the happening of the event complained of. But applying this stringent rule I conclude that the majority is in error because they treat the individual acts complained of as if they were distinct and separate incidents and did not constitute a manifestation of Pennsylvania's single plan and whole purpose (in which the individual defendants cooperated) to use Pennroad's funds and assets for the benefit and advantage of Pennsylvania without regard for the benefit or the loss which might occur to Pennroad and its security holders.

The record demonstrates that Pennsylvania's plan was conceived prior to Pennroad's incorporation and was carried

out as Pennsylvania intended. The first step in the execution of that plan was the purchase of the securities of DTI. Each of the purchases complained of made thereafter was another step in the execution of Pennsylvania's scheme. Each of the individual defendants contributed to the execution of the plan as a whole. They and Pennsylvania were in fact and in law parties to a civil conspiracy and employing the criminal law as an analogy the individual transactions complained of were nothing more than individual overt acts in furtherance of a single illegal end. The findings of fact embodied in the opinion of the District Court support this view.[64]

Many of the transactions upon which Pennroad was induced to enter are not complained of by the plaintiffs but they too constituted steps in the execution of the single plan. These include the loans made to Universal Fruit Company and to the Gerrard Company and the purchase of the stock of Raritan ' Railroad Company. Some of these transactions took place before March 31 and April 13, 1933.[65] Some occurred after that time. On the present record it is difficult to say when the execution of Pennsylvania's plan for the vicarious enjoyment of Pennroad's resources came to an end, but it is apparent that the execution of the scheme did not cease until independent voting trustees were designated and until such changes had been effected in the directorate of Pennroad that it was freed from the domination of Pennsylvania. While Mr. William M. Potts, a large holder of Pennroad's voting trust certificates, became a voting trustee at an earlier date, I think it is fair to conclude that the operation of the voting trust was not freed of Pennsylvania's domination until further changes in 1936 effected an independent majority among the voting trustees. It may be assumed that shortly after the event last mentioned the directorate of Pennroad was relieved of Pennsylvania management. But if we regard all the transactions demonstrated in the present record (including those not complained of) as but incidents in the execution of a single and whole plan by Pennsylvania with the cooperation of the individual defendants for the domination and control of Pennroad and its assets and even if we take the date of March 31, 1933, or ·April 13, 1933,[66] when Pennroad's directors ratified the sale of National Carloading to Standard Carloading, the six years prescribed by the statutes of limitations of Pennsylvania had not elapsed before the filing of the suits at bar. The critical date at which the statutes commenced to run was in fact much later than March 31, 1933.

I conclude, for the reasons hereinbefore stated, that whether the nature of the defendants' acts and their transgressions against Pennroad are to be considered as isolated incidents or merely steps in the execution of a single plan, should be determined by the law of Delaware. The statutes of limitations to be applied are, however, those of Pennsylvania. Substantive and remedial rights seem to merge in this instance and come close to being indistinguishable.[67]

No decision of the Delaware courts throws any clear light upon the question of substantive law here involved, though the decisions in Eshleman v. Keenan, Guth v. Loft, Inc., and in Bovay v. H. M. Byllesby & Co., supra, indicate that the courts of Delaware will not under circumstances like those at bar break down a course of dealings between corporate managers and their corporation into single, individual transactions. I conclude that if the present question were before the Delaware Chancery Court on a bill in equity containing allegations similar to those of the complaints at bar and the evidence presented was like that in the instant cases, the Court would adopt the reasoning of such cases as United States v. Kissel, 218 U.S. 601, 607, 31 S.Ct. 124, 54 L.Ed. 1168, Northern Kentucky Tel. Co. v. Southern Bell T. & T. Co., 6 Cir., 73 F.2d 333, 335, 97 A.L.R. 133, and Clark v. Machette, 92

---

[64] See 42 F.Supp. at page 601.

[65] As has been stated, on March 31, 1933, National Carloading was sold to Standard Carloading and Pennroad's Board ratified the sale on April 13, 1933, thus relieving Pennsylvania of the obligation, which it showed a measure of promise of fulfilling, of lifting from Pennroad of the burden of its freight forwarding transactions. From this point in time Pennroad had no hope of recovery from Pennsylvania except by way of suit.

[66] See Menges v. Frick, 73 Pa. 137, 13 Am.Rep. 731.

[67] See Holmes, The Common Law, 1881, at p. 253, and Chamberlayne, The Modern Law of Evidence, 1911, Section 171. The last authority cited states, "The distinction between substantive and procedural law is artificial and illusory. In essence there is none."

Colo. 365, 372, 21 P.2d 182, 184. In this connection see the decision of this court in Stentor Electric Mfg. Co. v. Klaxon Co., 125 F.2d 820, 824. Treating all the transactions demonstrated by this record as steps in the execution of a single plan, the Chancellor probably would hold that the period prescribed by the Delaware statute of limitations, would not commence to run, at the earliest, prior to March 31, 1933. It would seem fair to conclude, therefore, that the causes of action presented by the complaints in the cases at bar come before the District Court for the Eastern District of Pennsylvania, insofar as substantive rights are concerned, upon which the statutes of limitations of Pennsylvania may operate, as a single course of conduct constituting a civil conspiracy. See Brown v. Pennsylvania Canal Co., D. C., 229 F. 444, 452, affirmed by this court 235 F. 669. It would follow that the periods prescribed by those statutes should not be deemed to commence to run before the date last stated. I think that the courts of Pennsylvania would adopt such a rule and would treat the period prescribed by a Pennsylvania statute of limitations as not commencing to run until the end of the whole course of prohibited conduct. See Maslovsky v. Zellner, 29 Luz.L.Reg.Rep., Pa., 108. Compare the circumstances of such cases as Bailey v. Jacobs, 325 Pa. 187, 189 A. 320, and Ebbert v. Plymouth Oil Company, 338 Pa. 272, 13 A.2d 42.[68]

### The Pennsylvania Statutes and the Freight Forwarding Project.

The majority of this court hold that the liability of the defendants in respect to the freight forwarding project embarked upon by Pennroad at Pennsylvania's inducement are barred by the statute of limitations precisely as are the other transactions complained of. I have stated my reasons for concluding that these transactions and the defendants' participation in them did not come to an end until March 31 or April 12, 1933. If I am correct in my conclusions it is obvious that the liability of the defendants is not barred as to these transactions by either of the statutes of limitations upon which the majority rely. As heretofore stated, Mrs. Overfield's complaint, which originally complained of the freight forwarding transactions, was filed on March 30, 1939. Employing even the earlier date designated in this paragraph no statutory bar may be imposed.

### The Running of the Statutes of Limitations Was Tolled.

The majority hold that if there was concealment by the defendants such concealment must be "an affirmative, independent act," citing inter alia Smith v. Blachley, 198 Pa. 173, 47 A. 985, 53 L.R.A. 849; Bailey v. Jacobs, supra, and Ebbert v. Plymouth Oil Co., supra. The "independent act" in the majority view must constitute "affirmative efforts to divert, mislead, or prevent discovery," citing Deemer v. Weaver, 324 Pa. 85, 88, 187 A. 215, 216. I agree with the majority that the Pennsylvania decisions frequently refer to the necessity of "affirmative, independent act of concealment" over and above the original wrongful act complained of but I must dissent from the majority view as to what constitutes a correct interpretation of the Pennsylvania decisions. The Supreme Court of Pennsylvania though employing the language quoted above has mitigated the strictness of the announced rule by declaring rather slight instances of further concealment as sufficient to toll the running of the statutes of limitations here involved.

In Schwab v. Cornell, 306 Pa. 536, 539, 160 A. 449, 450, Justice Schaffer stated: "If the circumstances are such that a man's eyes should have been open to what is occurring, then the statute begins to run from the time when he could have seen, but if by concealment, through fraud or otherwise, a screen had been erected by his adversary which effectually obscures the view of what has happened, the statute remains quiescent until actual knowledge arises." In the Schwab case the defendant, a conveyancer, owed a duty to the plaintiff, the purchaser, to see that he obtained a clear title to certain land. When the settlement sheet of the title company was delivered to the defendant it

---

[68] In Bailey v. Jacobs it was not contended that Jacobs in converting the corporation's assets for his own personal use acted pursuant to a fixed plan or in conspiracy. In the Ebbert case, though there appears to have ben a concerted plan of action among the directors to charge to the corporation legal expenses due from the individuals, all charges had been made more than six years before the suit was started. It was held that the Act of 1867 barred recovery. In neither case did the Supreme Court of Pennsylvania pass upon the specific point here under discussion.

showed that some taxes were unpaid. The defendant did not inform the plaintiff of this defect in his title and the plaintiff took a deed on February 28, 1923. On June 28, 1923, in connection with mailing the recorded deed to the purchaser, the defendant wrote a letter to him stating that the title policy showed the title to be clear of liens with certain exceptions not here pertinent. The land was sold for taxes in 1928. The plaintiff brought suit on December 14, 1929, more than six years after the date of the letter from the defendant informing him that the property was clear of liens. The lower court decided that the date of the letter was the date at which the statute of limitations (the Act of 1713) began to run and barred the action. The Supreme Court reversed, holding that the plaintiff's eyes had been closed by the defendant's letter and that his cause of action did not ripen for suit until he received notice of the sale of the property for taxes. The holding of the Supreme Court is that if an act of concealment obscures the original wrong, the statute of limitations does not run until the injured person's eyes are opened.

In Deemer v. Weaver, supra, the holder of a life interest in real estate concealed from the remaindermen the fact that she had sold a piece of real estate for $9,000 instead of for $5,000 as she had reported to them. The sale took place in 1919 and a deed stating the consideration to be $5,000 was recorded almost immediately. Fifteen years later, three years after the death of the holder of the life interest, the remaindermen discovered the fraud and brought suit against the estate of the holder of the life interest. The lower courts held the action barred by the 1713 statute. The Supreme Court reversed the judgment, holding that the recording of the deed, showing a consideration of $5,000 was an affirmative act of concealment and that the statute did not begin to run until the discovery by the remaindermen of the actual price received by the holder of the life estate.

In Ebbert v. Plymouth Oil Co., supra, the directors of a Delaware corporation made use of funds of the corporation in connection with certain suits in which they were personally interested. The amount of these sums was carried upon the corporate books as "Deferred Charges." The Supreme Court held that the defendants in showing these sums among others as "Deferred Charges" in annual reports to stockholders had committed an affirmative act of concealment sufficient to toll the Act of 1867. Compare the later decision in this case, 348 Pa. 129, 34 A.2d 493.

In Bailey v. Jacobs, supra, Jacobs had withdrawn and converted corporate funds to his own use. The withdrawals were not entered upon the books of the company. This was treated as the act of concealment which tolled the running of the 1867 statute. It will be observed in the Jacobs case that the acts of concealment were concurrent with the original wrongs and that the *act* of concealment, treated as an *affirmative* act by the Supreme Court of Pennsylvania, was the *omission* of Jacobs to cause his withdrawals to be entered in the corporate books. Justice Stern, writing the opinion, stated that though there was no testimony that this concealment was the result of any direct order by Jacobs "there was evidence justifying a conclusion that [Jacobs] at least made a suggestion [to the bookkeeper] to that effect, and that he knew the withdrawals were not being noted upon the books * * *." See 325 Pa. at page 201, 189 A. at page 327.

In view of these decisions and particularly in the light of Bailey v. Jacobs, I think it is clear that the statutes of limitations relied on in the majority opinion have been tolled. The original wrong upon the security holders of Pennroad was the promotion of their company for the primary benefit of Pennsylvania and without regard to the benefit or loss to Pennroad, the employment of Pennroad by Pennsylvania, with the cooperation of the individual defendants,[69] as a Pennsylvania pocketbook. If I am correct in this conclusion, it is clear that numerous independent affirmative acts of concealment followed the original wrong. We need look no further than to that provision of Pennroad's charter declaring it to be one of Pennroad's purposes to aid other corporations, within the twenty-five percentum ownership clause, in any manner which the board of Pennroad might deem "advantageous to the Corporation [Pennroad] or to the holders of its stock." While it was understood by the stockholders of Pennsylvania and the holders of Pennroad's voting trust certificates that Pennroad might aid Pennsylvania, it was represented that that aid should be such as

---

[69] See note 56 supra, the 25th finding of fact made by the District Judge.

would be advantageous to Pennroad and its stockholders. See also the letter which General Atterbury sent on April 24, 1929 to the stockholders of Pennsylvania (more than 56% of whom became stockholders of Pennroad) and which states in part, "Your [Pennsylvania] directors are of the opinion that such an independent instrumentality [as Pennroad] is needed to protect your interests and those of your Company." Pennroad was not an "independent instrumentality." On the contrary it was in a state of subserviency.

In the financial statement sent by Pennroad to security holders on March 11, 1931, the securities owned by Pennroad as of December 31, 1930 are listed, but only the number of shares were given and not the prices paid for the stocks. One hundred twenty thousand shares of the common stock of National Freight Company are listed but no other statement is made in respect to National Freight. There is no suggestion in the statement that Pennroad had caused National Freight to be incorporated at Pennsylvania's inducement and was thereby engaging in a speculative venture, quite out of keeping with the ordinary activities of an investment company. The statement gives no indication that Pennroad had purchased securities above market prices or in excess of their true values, and there is no hint as to why it had done this. In Pennroad's statement for the year ended December 31, 1931, under the heading "Stocks for which Market Quotations are Available," the number of shares purchased is stated as is the cost to Pennroad and the market price of these securities as of December 31, 1931. This statement shows a huge loss in stocks for which market quotations were available, but it is not stated that Pennroad purchased stocks at prices in excess of market values. A security holder would have been compelled to break down the cost of each lot of securities by the number of shares and compare the prices thus arrived at with market values as of the probable time the securities had been purchased. Under such circumstances conclusions as to the reasonableness of prices paid by Pennroad would be almost pure surmise on the part of the ordinary voting-trust certificate holder. In the statement certain stocks are listed as "Stocks Having No Market Quotations Or Where Corporation Owns at Least a Majority of the Stock." This heading included stocks of Canton Company, DTI common, National Freight common, and PWV common. There is no indication that the National Freight common, carried in the statement at a value of $2,400,000, was worth very little by the end of 1931 or Canton common carried at a value in excess of $13,400,000 was worth much less. Any suggestion as to the true value of PWV common, carried in the statement at nearly $38,000,000, is lacking.

Pennroad sent statements substantially similar in tenor to its security holders for the years 1932 and 1933. In its statement as of December 31, 1934 it again carried its investment at cost, but did not state market values. This is true also in the statements for the years 1935 and 1936.

That the attitude of Pennsylvania and Pennroad in withholding vital information was part of a settled policy is demonstrated by the record. As early as July, 1930, Mr. County in a "Personal" memorandum to Mr. Lee, referred to Barron's National Business and Financial Weekly for July 7th which showed a depreciation in the securities of another investment company and wrote: "In the proposed statement of The Pennroad, I think you should avoid any allusion to the market value of the securities. Let somebody else do the figuring." Mr. Lee stated in a letter to The Melrose Trust Company of Massachusetts, a holder of 2500 voting trust certificates, in reply to an inquiry respecting Pennroad's ownership of stock of the Boston and Maine: "We have followed the policy so far of not ourselves making any public statements with regard to our ownerships of securities nor of any details connected therewith. * * *"

On the advice of counsel Pennroad made no mention of the pending Perrine suit in Delaware, which referred to some of the transactions complained of in the suits at bar. Mr. Ogden expressed the views of Pennroad's financial and legal advisers when he wrote that they were "emphatically adverse to making any statement about * * * [the suit] as it would only stir up stockholders, many of whom possibly knew nothing about it, although I believe, if the suit is finally dismissed, some reference might be made to it in the annual report or other statement sent out by the Corporation." [70]

---

[70] See Mr. Ogden's memorandum of November 23, 1932, relating to his conference with Messrs. George W. Bovenizer and Leonard D. Adkins.

In the proxy statement dated February 14, 1941, sent out prior to the annual meeting of stockholders of Pennroad, the voting trust having come to an end, reference was made to the suits at bar and to the answers which Pennroad had filed to the complaints. This notice contained the statement "* * * that similar suits by other individual stockholders have been instituted, and other suits of like character have been threatened; and that as credibly informed the present directors of The Pennroad Corporation believe that the investments and transactions complained of were made in the exercise of reasonable care and prudence in the light of the then prevailing conditions and in the interests of The Pennroad Corporation." The statement was signed by Mr. Lee as president of Pennroad. In view of the circumstances surrounding the purchases of Seaboard and National Freight stock—to employ two examples—with which Mr. Lee was conversant, it is impossible for me to consider the words quoted from the notice as anything other than an effort made by Mr. Lee to lull the stockholders of Pennroad into quietness. In my opinion the contents of this notice are sufficient to toll the statutes of limitations as to those stockholders of Pennroad who were without knowledge of the Wheeler Report or of the nature of the pending suits. It appears from the decisions of the Supreme Court of Pennsylvania heretofore cited, that the point in time at which the independent affirmative act of concealment takes place is immaterial. Once it has taken place the statutes will not begin to run until after the deceived person's eyes have been opened.[71]

As to independent affirmative acts of concealment in respect to some of the specific transactions complained occurring after their consummation, a few examples will suffice. As to the freight forwarding transactions, Pennroad's financial statements never disclosed the fact that Pennsylvania received more than $3,000,000 from National Freight or National Carloading by way of rentals and freight charges, or that the sale of National Carloading was made to Standard Carloading in 1933 for $400,000 in notes. The statement which Pennroad sent to its security holders in February, 1934, carried National Freight common at $2,400,000 but with the sale of National Carloading, National Freight had become a mere corporate shell worth little or nothing. If the $400,000 of 6% notes which National Freight received from Standard Carloading were included in Pennroad's statement for the year ending December 31, 1933, this asset was undisclosed and lay under some other heading. Compare the facts of Bailey v. Jacobs, and Ebbert v. Plymouth Oil Co., supra. It was not disclosed to Pennroad's security holders that National Freight had sold National Carloading to Standard Carloading, thereby relieving Pennsylvania of an obligation to take that failing enterprise out of Pennroad's hands. As to the purchase of Seaboard stock it was never disclosed in any report to Pennroad's security holders that Pennroad had involved itself in a disastrous underwriting agreement for the benefit of Pennsylvania, and there was no disclosure until October, 1933, that Pennroad was bound by a private oral agreement not to sell the Seaboard stock purchased by it until September 30, 1930. As a result of this agreement Pennroad held its Seaboard stock against a declining market. As to not one of the transactions complained of did Pennroad ever disclose to its security holders the reason why it paid prices higher than market or true value for securities such as those of PWV. It may be argued that financial statements ordinarily do not contain such material, but the short answer to such an assertion is that persons or corporations acting in a fiduciary capacity are required to give all pertinent information to their cestuis as to investments into which trust funds are put. Since the defendants in the instant cases have pleaded the statutes of limitations of Pennsylvania, the issue of what should have been disclosed by Pennroad in its statements to its security holders is most pertinent.

## Conclusions.

The cases at bar are sui generis. I conclude that none of the transactions complained of, whether they be considered as separate causes of action or as incidents in the execution of a single plan, is barred by the statutes of limitations of Pennsylvania even if such statutes are applicable. I conclude also that the plaintiffs and the stockholders they represent have not been guilty of laches. It is my opinion also that no transaction which Pennroad entered into for the benefit of Pennsylvania pursuant to Pennsylvania's plan is barred presently by limitations or laches. Equity must do

---

[71] See for example Deemer v. Weaver, supra, 324 at page 88, 187 A. at page 216.

full and complete justice between the parties. This would require that all investments made by Pennroad, from its incorporation to the date at which it obtained an independent board of directors, whether complained of or not, should be thrown into an accounting. The transactions which resulted in a profit for Pennroad (the purchase of the stock of Raritan Railroad Company, for example) should be included in the accounting as well as those which resulted in a loss. The sums expended by Pennroad should be totalled and interest allowed thereon at the rate of 6% per annum until the date of the final judgment. There should be allowed to the defendants as a setoff against this sum the amounts received by Pennroad from the investments plus the value of the securities held by Pennroad as of the end of the critical period designated. The defendants should be held to be jointly and severally liable for the net amount determined by this formula. The problem is one of accounting. The course suggested in my opinion is required by the unusual circumstances presented in the instant cases.

The judgments should be reversed and the cases remanded with directions to the court below to permit such amendments to the pleadings as may be necessary to effect the result suggested. Opportunity should be afforded for the presentation of such further evidence as may be required. Additional findings of fact and conclusions of law should be made by the learned District Judge as the circumstances and the law may warrant.